**RUTHRAUFF, INC., Appellant,**

v.

**RAVIN, INCORPORATED, and Burley's Rink Supply, Inc., Appellee.**

**Ruthrauff, Inc., Appellee**

v.

**Ravin, Incorporated And Burley's Rink Supply, Inc.**

**Appeal of Ravin, Incorporated, Appellant.**

Superior Court of Pennsylvania.

Argued Aug. 29, 2006.

Filed Dec. 8, 2006.

Reargument Denied Feb. 7, 2007.

James R. Hankle, Pittsburgh, for Ruthrauff.

Robert J. Behling, Pittsburgh, for Ravin.

BEFORE: HUDOCK, BENDER and TAMILIA, JJ.

OPINION BY BENDER, J.:

¶ 1 In these consolidated appeals, Ruthrauff, Inc. ("Ruthrauff"), the subcontractor plaintiff in this construction litigation, sought to obtain $55,940.00, which it alleged that defendant, Ravin, Incorporated ("Ravin"), wrongfully withheld as retainage under a contract for, *inter alia,* installation of an infrared tube heating system above bleachers in an ice skating rink in Allegheny County known as the Castle Shannon Ice Castle.[1] The trial court awarded Ruthrauff the amount it sought, but refused to award interest on the retainage, attorneys' fees, expenses, and penalties under the Contractor and Subcontractor Payment Act, 73 P.S. §§ 501–516 (the "Act"). Ravin, the general contractor on the ice rink construction project, in a breach of contract counterclaim filed against Ruthrauff based on its dissatisfaction with the heating system above the bleachers, sought to obtain $34,500.00, which represented the cost of replacing the system. The trial court granted Ravin relief on its counterclaim.

---

1. In addition to heating work, Ruthrauff also bid on air-conditioning, plumbing, and fire protection work for the Ice Castle facility. The issues in the instant appeals, however, concern the infrared tube heating system installed above the bleachers adjacent to the two rinks in the facility to provide spot heating for spectators.

¶ 2 In its appeal, Ruthrauff claims that the trial court erred by granting Ravin relief on its counterclaim for costs of replacing the heating system, and that the trial court erred by refusing to grant interest on the retainage, attorneys' fees, expenses, and penalties as per the Act. Ravin, on the other hand, filed a cross appeal in which it asserts that the trial court erred by finding that Ruthrauff was entitled to recover, under theories of unjust enrichment and *quantum meruit*, for additional work it performed outside the warranty period.

¶ 3 For the following reasons, we conclude that the trial court erred by finding in Ravin's favor on its counterclaim to recover the cost of the replacement heating system above the bleachers. Further, we find that the trial court erred by denying an interest award on the retainage to Ruthrauff under the Act, but did not err by denying a penalty award under the Act.[2] Finally, we affirm the trial court's decision finding in Ruthrauff's favor on its unjust enrichment claim against Ravin.

¶ 4 A factual and procedural history follows. Ralph Paul Murovich, a shareholder of the general contractor, Ravin, is also a partner of Ice Castle's owner, a development company called Tymaco, Incorporated. N.T. Trial, 4/5–6/05, at 244. In planning to build the Ice Castle ice skating rink, which was constructed in 2000, Murovich brought in John Burley, of Burley's Rink Supply, Inc., as the rink designer. Burley specialized in equipment related to maintaining the ice surfaces. *Id.* at 246–47. Burley, who also had his own ice rink in Johnstown, was slated to install the ice making system at the Ice Castle. Quinn

Deposition, 10/7/03, at 18 (entered into evidence at trial).

¶ 5 Murovich and Ravin's vice president, Regis Mark Quinn, visited Burley's Johnstown rink prior to construction and observed the heaters over the bleachers. N.T. at 299; Quinn Deposition at 18, 21. Burley told Murovich that he had a "good heating system for over the bleachers." N.T. at 300.

¶ 6 Ravin hired its own engineer, Gerald A. Herron, for the Ice Castle project.[3] Herron testified that Ravin hired him to perform electrical and mechanical design for the Ice Castle based on the design of Burley's ice rink. Herron Deposition, 10/6/03, at 9, 83 (entered into evidence at trial). Herron admitted that he was instructed by Ravin to "copy the Burley rink" design. *Id.* at 15, 83. Accordingly, Herron obtained Burley's drawings and based his electrical and mechanical design for the Ice Castle on Burley's drawings. *Id.* at 20–21.

¶ 7 Herron obtained the specifications for the infrared heaters to be placed above the bleachers from Burley. *Id.* at 83. Thus, the specifications for the heaters originated from Burley, *see infra,* who had the same heaters in his Johnstown rink. *Id.* at 13–15, 89. Indeed, Burley, whom Herron considered to be an expert, also initially told Herron that the heaters above the bleachers in his rink worked "just fine" and that those were the heaters that Herron needed at the Ice Castle. *Id.* at 89, 95–96.

¶ 8 Pursuant to Burley's rink design, Herron made preliminary drawings of the

---

2. As explained *infra,* we remand to the trial court for a determination of whether Ruthrauff is entitled to attorneys' fees and expenses under the Act in light of the modifications made to the verdict herein.

3. Murovich also hired his father's architectural firm, Ralph J. Murovich Associates. N.T. at 297. Both Herron's stamp and Murovich Associates' stamp appear on the Ice Castle drawings.

ice rink, dated May 22, 2000. Additionally, he drew-up preliminary schedules, also dated May 22, 2000, in which he specified the same infrared heater over the bleachers that Burley had at his rink. Particularly, the schedules specified a gas "infrared tube heater," manufactured by "Enerco or equal," model number "ER150," 150,000 BTUs, 120 volts, with a length of 51–feet, 10–inches. N.T. at 57, 96, 107, 301, 339; Preliminary Schedules, 5/22/00, M–4; Herron Deposition at 40. Specifics were indicated for the flue and gas connection also. Preliminary Schedules, M–4. Additionally, the schedules indicated "maximum of four burners on 1/20A circuit[,]" "thermostat at rink level[,]" "maintain manufacturer's clearances[,]" and other keyed notes.

¶ 9 Despite these specificities with regard to the type of heater to be installed on the preliminary schedules, the preliminary floor plan drawings of the rink did not indicate the number, location, or configuration of these heaters. Preliminary First Floor Plan B, 5/22/00; N.T. at 96. In other words, the heaters were absent from the floor plan layouts. *Id.;* N.T. at 250.

¶ 10 In June of 2000, based on Herron's preliminary drawings and the preliminary schedules, Ruthrauff submitted a bid to Ravin for HVAC,[4] plumbing, and fire protection work on the Ice Castle project. N.T. at 28, 56, 316. Specifically with regard to HVAC work, Ruthrauff proposed to "[f]urnish and install complete HVAC system *per plans and specifications.*" Ruthrauff HVAC Proposal, 6/27/00 (emphasis added). Ray Gajski, Ruthrauff's HVAC project manager, testified that Ruthrauff did not decide on the number, make, or model of heaters to be installed, as these were already specified by Ravin's engineer, Herron. N.T. at 61.

¶ 11 Ruthrauff won the work it bid upon for the Ice Castle construction project. In addition to other HVAC, plumbing, and fire alarm work, Ravin's vice president, Quinn, admitted that Ruthrauff was hired to furnish and install the heaters above the bleachers. Quinn Deposition at 31. Indeed, Quinn sent a letter of intent to Ruthrauff, dated July 12, 2000, in which he indicated that Ravin intended to enter into a contract for HVAC, plumbing, and fire protection work with Ruthrauff. Quinn's letter indicated that the "scope of work shall be defined in the construction drawings and specifications" provided by Murovich Associates, Herron, and Burley's Rink Supply.

¶ 12 Nevertheless, despite the magnitude of this construction project, Ruthrauff and Ravin did not enter into a separate written construction contract. Rather, at trial, Ravin, via Murovich's testimony, agreed that the "contractual" documents in this case included Ruthrauff's June 27, 2000 HVAC proposal letter, *see supra,* in which it identified the "scope of work" to encompass furnishing and installation of complete HVAC system "as per plans and specifications," and Quinn's letter of intent which similarly defined the scope of work as that provided by Murovich Associates, Herron, and Burley. Ruthrauff HVAC Proposal, 6/27/00; Letter of Intent, 7/12/00; N.T. at 297–98. The other documents described at trial as "contractual," included Herron's May 22, 2000 drawings that did not show the location or number of the heaters to be installed on the rink floor plans but, as described above, did detail specifications on the schedules for the heaters Ravin wanted to have installed.

¶ 13 Notably, none of these "contractual" documents indicate that Ruthrauff had

4. HVAC encompasses heating, ventilation, and air conditioning.

any contractual duty to provide design, engineering, or layout services with regard to the bleacher heaters. In fact, both Herron and Murovich admitted that Ruthrauff was not hired to provide design services. Herron Deposition at 28–29; N.T. at 300. Indeed, the trial record, as more fully explained below, reveals that Ruthrauff's contractual obligations were to obtain the materials and perform the installation of the bleacher heating system as specified by Ravin's own consultant (Burley, who was himself on the job as a subcontractor for the rink work) and Ravin's own engineer (Herron), who, again, was instructed by Ravin to "copy Burley's rink."

¶ 14 In any event, minutes from a project meeting on August 1, 2000, revealed that Ruthrauff, via their project manager, Ray Gajski, asked Ravin where the heaters should be located. Ravin Meeting Minutes # 1 Ice Castle, 8/1/00, at ¶ 1.3. The minutes do not indicate anything further with regard to this question.

¶ 15 However, soon thereafter, Herron drafted updated drawings, dated August 9, 2000, which do show placement of one long tube heater over each of the portable seating areas (i.e., bleachers) next to each of the two rinks, with no change in the specifications for these heaters. See Dwg. Nos. M2.2, M–2.3, M–3.2, M–3.3, 8/9/00; Herron's Deposition at 54. Herron affirmed that these drawings show one tube heater per rink, which Herron placed on the drawings in accordance with Burley's rink design. Herron's Deposition at 89. In fact, Herron's updated drawings of August 9, 2000, indicate, under "Mechanical—Basic Requirements" that "all M.C. work as shown on attached Burley Rink Supply drawings." Dwg. No. M–1, 8/9/00.

¶ 16 Gajski testified that Ruthrauff, as the installation contractor, was responsible for installing the heaters as per the manufacturer's recommendation with regard to such things as clearance from combustibles and recommended mounting height elevations. N.T. at 65. The manufacturer's cut sheet, which Ruthrauff obtained from their supplier, provided these recommended specifications. Id. at 66. Prior to installation of the heaters, on August 7, 2000, Ruthrauff submitted to Ravin, for their approval, the manufacturer's cut sheet for the Enerco heaters. Id. at 304. In addition to providing the mounting specifications, the cut sheet showed both a straight infrared tube heater configuration, like the one Burley had in his rink, and a "U-tube" configuration. However, the U-tube configuration drawing was crossed-out. Nevertheless, Herron made no objections to the cut sheet, and Herron approved it on August 15, 2000. Following this approval, Ruthrauff installed the straight tube heaters as per the manufacturer's recommendations and in the locations Ravin requested, as per Ravin's updated August 9, 2000 drawings. Id. at 66–68.

¶ 17 After installation, Ruthrauff tested the heaters and determined that they were operating. Id. at 68–69. At that point, December of 2000, Ravin had accepted Ruthrauff's work. Id. at 69. However, in February of 2001, following completion of the Ice Castle construction, Ravin complained that the heaters were melting portions of the ice. Id. at 68–69. At their own cost, Ruthrauff returned to the Ice Castle and, after discussions with Ravin, tilted the reflectors on the heaters away from the ice and more toward the bleachers. Id. at 70. This appeared to remedy the ice-melting situation and Ravin appeared to be satisfied. Id. at 70–71.

¶ 18 Approximately one month later, Ravin complained to Ruthrauff that the heaters were still not heating the bleachers to their satisfaction. Id. at 71. Ruthrauff called the manufacturer who suggested in-

stalling an orifice kit, which the manufacturer provided at no charge. *Id.* Ruthrauff installed the kit, which increases heat output, measured by BTUs, by 25%. *Id.* at 71–72. Indeed, Ruthrauff observed additional heat output. *Id.* at 72.

¶ 19 Nevertheless, about two months later, Ravin again complained that it was not satisfied with the heat output provided. *Id.* The manufacturer went to Ice Castle to examine the heaters and indicated that they were performing as expected. *Id.* at 73. Gajski also testified that Ravin's engineer, Herron, indicated that the installation was "exactly what he had in mind." *Id.* at 77.

¶ 20 Following several verbal change orders during the course of the Ice Castle construction, the total contract price due from Ravin to Ruthrauff was $546,329 for all the work Ruthrauff provided on the Ice Castle. *Id.* at 39. Nevertheless, due to its dissatisfaction with the infrared tube heating system installed above the bleachers, Ravin retained $55,940 in payments. *Id.* at 52.

¶ 21 In a letter dated January 21, 2002, Ruthrauff indicated to Ravin that there remained an outstanding balance of $55,940, even though the project had been completed for over 13 months, and that Ravin had ignored Ruthrauff's attempts to collect this balance. *Id.* at 78. Ruthrauff also presented Ravin with a letter from Enerco indicating that the heaters had been properly installed. *Id.* at 80.

¶ 22 Ruthrauff again demanded payment on April 5, 2002. *Id.* Ruthrauff indicated in that letter that it had fully complied with the contract and completed a timely, quality installation in December of 2000. Letter, 4/5/02. Attached to this letter was a copy of a letter from the manufacturer, Enerco, indicating that, after visiting Ice Castle in February of 2002, they determined that the units installed by Ruthrauff

were "operating correctly[;]" however, they further stated: "Although the installation by the installer is correct, the results they are getting are typical for spot heating with straight tube heaters." Enerco Letter, 2/11/02. Enerco recommended the U-tube installation kit and provided a proposed layout. *Id.* Enerco stated that the "U-tube accessory kit is always recommended for spot heating applications. The tube heater utilizing the u-tube kit will allow for more heat [and] even distribution in a more defined area." *Id.* Additionally, Enerco recommended four heaters per side as opposed to the two heaters installed by Ruthrauff. *Id.;* N.T. at 277. Thus, the proposed fix recommended by the manufacturer was to use a U-tube configuration and to increase the number of heaters. Enerco Letter, 2/11/02; N.T. at 324.

¶ 23 Murovich testified that he intended to have spot heating over the bleachers, that Ruthrauff promised him it would "make it right," and that he left the specifics up to Ruthrauff with regard to how to achieve proper spot heating. N.T. at 277. Nevertheless, after receiving the letter from Enerco, Ruthrauff did not indicate they would attempt to fix the system or otherwise follow Enerco's recommendations. *Id.* at 277. However, it is worth noting that, by that point in time, Ruthrauff had been off the job for 13 months and was demanding payment.

¶ 24 Ravin hired another HVAC contractor, Climatech, Incorporated, to fix the bleacher heating problem. Climatech recommended retrofitting the existing heaters with the U-tube configuration for a cost of $34,500. *Id.* at 334. This is the amount Ravin sought, and won, in their counterclaim against Ruthrauff.

¶ 25 Moreover, it was only after Ravin complained about the ineffectiveness of the

heating system above the bleachers that Burley or one of Burley's employees told Herron that they never used the heaters at Burley's rink in Johnstown because they do not work. Herron Deposition at 95–96. This was contrary to Burley's pre-construction pronouncements to Ravin that the heaters worked well.

¶ 26 Ruthrauff initiated this litigation by filing a complaint against Ravin and Burley's Rink Supply, Inc., on June 7, 2002.[5] Ruthrauff asserted a breach of contract claim, a claim for money due under the Act, and unjust enrichment. Ruthrauff sought to recover, *inter alia*, $55,940.00 in retainage from Ravin, and $4,747.17 to recoup costs of its numerous visits to the rink in 2001 in an attempt to increase the heating output or otherwise remedy the bleacher heating problem. Ravin filed an answer with new matter and a counterclaim for breach of contract against Ruthrauff on September 19, 2002, seeking the cost of the replacement heating system. Ravin asserted that Ruthrauff failed to provide and install HVAC systems in accordance with their agreement.

¶ 27 The court held a non-jury trial on April 5 and 6, 2005. On June 17, 2005, the trial court rendered its verdict in favor of Ruthrauff in the amount of $55,900.00 for the amount retained by Ravin, and $4747.17 for the additional work Ruthrauff performed in its attempt to remedy Ravin's dissatisfaction with the heating sys-

tem. Thus, the total amount awarded to Ruthrauff was $60,647.17. However, the trial court denied Ruthrauff's request for interest, attorneys' fees, and penalties under the Act on the amount of the retainage. Additionally, the trial court found in favor of Ravin on its counterclaim for replacement of the heaters in the amount of $34,500.00. Accordingly, the net amount due, from Ravin to Ruthrauff after setting off the above amounts, was $26,147.17.

¶ 28 Each party filed motions for post trial relief, which the court denied on October 25, 2005. On November 18, 2005, Ruthrauff filed a notice of appeal (docketed at 2002 WDA 2005), and on December 1, 2005, Ravin filed a notice of appeal (docketed at 2062 WDA 2005), which are now consolidated before us. Judgment on the verdict in favor of Ruthrauff was entered on the docket on January 31, 2006, and judgment on the verdict in favor of Ravin was entered on the docket on February 13, 2006. These final judgments, although entered after the parties filed their notices of appeal, acted to perfect the parties' appeals. *Turney Media Fuel, Inc. v. Toll Bros., Inc.*, 725 A.2d 836, 838 n. 1 (Pa.Super.1999).[6] We will address Ruthrauff's issues first.

¶ 29 Ruthrauff contends that (1) the trial court erred by granting Ravin relief in the amount of $34,500.00 on its counterclaim for the cost of replacement heaters; and (2) the trial court erred by denying its

---

5. Burley's Rink Supply is not a party in this appeal. By the time of trial, Burley's Rink Supply had filed for bankruptcy in federal court and Ruthrauff had planned to pursue its claims against Burley's Rink Supply in that venue. *See* N.T. at 3.

6. We further note that each party took their appeals from the order denying post trial motions, which is generally considered interlocutory and not appealable unless reduced to judgment. *Jones v. Rivera*, 866 A.2d 1148, 1149 n. 1 (Pa.Super.2005). Nevertheless, as

judgment was entered subsequent to the parties filing their notices of appeal, the appeals have been perfected. *Id.; Turney Media Fuel*, 725 A.2d at 838 n. 1; Pa.R.A.P. 905(a) ("A notice of appeal filed after the announcement of a determination but before the entry of an appealable order shall be treated as filed after such entry and on the day thereof."). We have corrected the captions to reflect the two dates that judgments on the verdict were docketed.

request for interest on the retainage, attorneys' fees, penalties, and costs under the Act. *See* Ruthrauff's brief at 9.

¶ 30 In its opinion filed pursuant to Pa. R.A.P. 1925(a), the trial court explained that it granted Ravin's counterclaim for the cost of replacing the heating system because Ravin had contracted for a "proper and working system[.]" Trial Court Opinion (T.C.O.), 2/24/06, at 6. The trial court also indicated that it did not believe testimony on behalf of Ruthrauff that it was instructed to follow the pattern of the heating system at Burley's ice rink. *Id.* at 4.

¶ 31 We recognize that, with regard to factual determinations, the trial court acts as the factfinder in a bench trial and may believe all, part or none of the evidence presented. *Turney Media Fuel,* 725 A.2d at 841. Issues of "credibility and conflicts in evidence are for the trial court to resolve; this Court is not permitted to reexamine the weight and credibility determinations or substitute our judgment for that of the factfinder." *Id.* Furthermore, "the findings of the judge in a nonjury trial are given the same weight and effect as a jury verdict such that the court's findings will not be disturbed on appeal absent an abuse of discretion, error of law, or lack of support in the record." *Id.* We will not disturb the court's factual findings merely on the basis we would have reached a different conclusion; rather, our task is to "determine whether there is competent evidence in the record that a judicial mind could reasonably have determined to support the finding." *John B. Conomos, Inc. v. Sun Co., Inc.,* 831 A.2d 696, 703 (Pa.Super.2003). In the instant case, however, we conclude initially that the trial court's conclusions with regard to Ravin's breach of contract claim are not supported by the record.

¶ 32 "To be enforce[a]ble, a contract must be complete. That is to say, it must represent a meeting of the parties' minds on the essential terms of their agreement." *Yellow Run Coal Co. v. Alma-Elly-Yv Mines, Ltd.,* 285 Pa.Super. 84, 426 A.2d 1152, 1154 (1981). "When the trier of fact has determined the intention of the parties to an agreement, an appellate court will defer to the findings, so long as they are supported by the evidence." *Id.* at 1155. Moreover, "[a]ny number of documents can be taken together to make out the necessary written terms of the bargain provided there is sufficient connection made out between the papers, without the aid of parol evidence, further than to identify papers to which reference is made, but not to supply a material term of the contract." *American Leasing v. Morrison Co.,* 308 Pa.Super. 318, 454 A.2d 555, 559 n. 7 (1982). A party claiming breach of contract must establish "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." *Williams v. Nationwide Mut. Ins. Co.,* 750 A.2d 881, 884 (Pa.Super.2000) (citation omitted).

¶ 33 Although we generally defer to the trial court's factual findings, there is no evidence in the record to support the trial court's conclusion that Ruthrauff was contracted to provide design engineering expertise on the Ice Castle project. To the contrary, the various documents deemed "contractual," which included Ruthrauff's HVAC bid proposal letter, the letter of intent composed by Quinn, and Herron's preliminary drawings and specifications, indicate that Ruthrauff's duties were to procure the materials as specified by Ravin and to perform the installation of these materials. As described above, Ravin's own engineer, architect, and consultant specified the tube heating system to be installed in detail, placed these on updated

drawings in accordance with Burley's rink design, and Ruthrauff installed these materials in accordance with Herron's plans and the manufacturer's recommendations from the cut sheet that was, likewise, approved by Ravin.

¶ 34 It appears that the trial court relied on Murovich's testimony that one of his considerations in hiring Ruthrauff was the fact that they had an engineering department and he expected that they would perform engineering with regard to their installation. N.T. at 300–301 (stating, "if something wasn't done, they had the wherewithal to engineer it. That was one of my considerations for hiring them"). Nevertheless, there are numerous places in the record where Ravin's *own* witnesses, including Murovich, conceded that their intent was to copy Burley's rink design and that Ruthrauff was not hired to perform design services.

¶ 35 For example, Murovich admitted that he had no written contract provision indicating that Ravin hired Ruthrauff to perform any design engineering work on the Ice Castle project. *Id.* at 300. Additionally, Herron admitted that Ruthrauff properly installed the heaters that were specified and stated that, as Ravin's engineer, he was not dissatisfied in any way with Ruthrauff's installation which appeared to be complete. Herron Deposition at 66, 68–69. Herron affirmed that Ruthrauff had no involvement in specifying or deciding which units to install on the Ice Castle project. *Id.* at 69. Herron also affirmed that, to his knowledge, no one at Ruthrauff had any involvement in the design aspect of the Ice Castle. *Id.* at 28–29.

¶ 36 Given the lack of evidence of a contractual term imposing a duty on Ruthrauff to design engineer the heating system, the trial court erred in granting relief on Ravin's breach of contract claim. *See also Canuso v. City of Phila-*

*delphia,* 326 Pa. 302, 192 A. 133, 136 (1937) ("[A] contractor, even though a specialist, who builds according to the owner's plans, is not responsible for the sufficiency of the work."). In sum, the contractual documents encompassing the parties' agreement unambiguously circumscribed Ruthrauff's responsibility to order the materials that Ravin specified and to install these materials, and Ravin's own witnesses testified that Ruthrauff was hired to provide materials and installation, *not* design expertise. Thus, the record does not support the trial court's finding that Ruthrauff was contractually obligated to employ its design engineering expertise to *sua sponte* alter the design (as, for example, by installing the U-tube configuration that was ultimately recommended by the manufacturer in 2002) and/or deviate from instructions provided by Ravin's own engineer, architect, and consultant. Accordingly, we reverse the judgment in favor of Ravin in the amount of $34,500.

¶ 37 Next, Ruthrauff claims that the trial court erred by refusing to award interest on the retainage, penalties, attorneys' fees, and expenses under the Act. Since this issue involves interpretation of the Act, we set forth the following precepts to guide our review:

[W]hen determining the meaning of a statute, a court must construe the words of that statute according to their plain meaning. 1 Pa.C.S.A. § 1903(a); *Ludmer v. Nernberg,* 699 A.2d 764, 765 (Pa.Super.1997). When the words of a statute are [clear and free from all ambiguity], they are not to be disregarded under the pretext of pursuing the spirit of the statute. 1 Pa.C.S.A. § 1921(a); *Commonwealth v. Heberling,* 451 Pa.Super. 119, 678 A.2d 794, 795 (1996). It is only when the statute is unclear that the court may embark upon the task of

ascertaining the intent of the legislature. *Id.* Absent a definition, statutes are presumed to employ words in their popular and plain everyday sense, and popular meanings of such words must prevail. *Centolanza v. Lehigh Valley Dairies, Inc.,* 540 Pa. 398, 406, 658 A.2d 336, 340 (1995); *Commonwealth v. Kelley,* 569 Pa. 179, 801 A.2d 551, 555 (2002). *Nippes v. Lucas,* 815 A.2d 648, 650 (Pa.Super.2003). Moreover, issues involving statutory interpretation present questions of law for which our standard of review is *de novo* and our scope of review is plenary. *Kopko v. Miller,* 586 Pa. 170, 892 A.2d 766, 770 (2006).

¶ 38 The underlying purpose of the Act is to protect contractors and subcontractors. *Nippes,* 815 A.2d at 651; *R.W. Sidley, Inc. v. U.S. Fidelity & Guar. Co.,* 319 F.Supp.2d 554, 560 (W.D.Pa.2004). "The Act provides payment deadlines and penalties to encourage fair dealing among parties to a construction contract." *Joseph F. Cappelli & Sons, Inc. v. Keystone Custom Homes, Inc.,* 815 A.2d 643, 646 (Pa.Super.2003). Indeed, the Act provides that "[p]erformance by a contractor or a subcontractor in accordance with the provisions of a contract shall entitle the contractor or subcontractor to payment from the party with whom the contractor or subcontractor has contracted." 73 P.S. § 504 ("Performance by contractor or subcontractor"). The Act also specifically protects subcontractors by similarly providing that "[p]erformance by a subcontractor in accordance with the provisions of the contract shall entitle the subcontractor to payment from the party with whom the subcontractor has contracted." *Id.* at § 507(a).

¶ 39 The Act recognizes that certain payments may be subject to retainage under a construction contract between the parties. *Id.* at § 509 ("Retainage"). This section provides that "a contractor may withhold retainage from a subcontractor in accordance with their agreement[,]" but that the "retainage shall be paid within 30 days after final acceptance of the work." *Id.* at § 509(b). Additionally, if a contractor "unreasonably withholds acceptance of work or fails to pay retainage as required by this section" then that contractor "shall be subject to the payment of interest ... on the balance due and owing on the date acceptance was unreasonably withheld or the date retainage was due and owing, whichever is applicable." *Id.* at § 509(d). Section 505(d) provides for an interest rate of 1% per month on the retainage. *Id.* at § 505(d).

¶ 40 Attorneys' fees, expenses, and penalties are also recoverable under the Act pursuant to the following provisions:

### § 512. Penalty and attorney fee

(a) **Penalty for failure to comply with act.**—If arbitration or litigation is commenced to recover payment due under this act and it is determined that an owner, contractor or subcontractor has failed to comply with the payment terms of this act, the arbitrator or court shall award, in addition to all other damages due, a penalty equal to 1% per month of the amount that was wrongfully withheld. An amount shall not be deemed to have been wrongfully withheld to the extent it bears a reasonable relation to the value of any claim held in good faith by the owner, contractor or subcontractor against whom the contractor or subcontractor is seeking to recover payment.

(b) **Award of attorney fee and expenses.**—Notwithstanding any agreement to the contrary, the substantially prevailing party in any proceeding to recover any payment under this act shall be awarded a reasonable attorney fee in

an amount to be determined by the court or arbitrator, together with expenses.

73 P.S. § 512. Thus, a 1% per month penalty on an amount wrongfully withheld is recoverable when it is determined that the contractor "has failed to comply with the payment terms" of the Act. *Id.* at § 512(a). Additionally, reasonable attorneys' fees and expenses shall be awarded to the "substantially prevailing party in any proceeding to recover any payment" under the Act. *Id.* at § 512(b).

¶ 41 Given the above statutory language, the logical place to begin our analysis is with our previous determination that Ruthrauff was contractually obligated to procure materials for the heating system as specified by Ravin and to install these materials. The record establishes that Ruthrauff performed these duties. Thus, according to section 507(a), Ruthrauff was entitled to receive payment from Ravin. Yet, Ravin withheld retainage. Accordingly, we must next determine whether the record supports the trial court's denial of (1) interest on the retainage (*i.e.,* based on whether Ravin "unreasonably withheld" acceptance of the work, *see* § 509(d)); (2) penalties on the retainage (*i.e.,* based on whether Ravin "wrongfully withheld" the retainage, *see* § 512(a)); and (3) attorneys' fees (*i.e.,* based on a determination of whether Ruthrauff is a "substantially prevailing party," *see* § 512(b)).

■■■ ¶ 42 The trial court concluded that Ravin did not unreasonably or wrongfully withhold acceptance of the work subject to the retainage, because there was a "genuine dispute" between the parties, and there was no evidence that Ravin withheld the retainage for vexatious, unreasonable, or wrongful purposes. T.C.O. at 7. Ruthrauff argues that the trial court erred in this determination and that "the record is replete with evidence that Ravin unreason-ably held Ruthrauff responsible for its dissatisfaction with the radiant tube heaters that [Ravin's] own engineer and consultant specified." Ruthrauff's brief at 14.

¶ 43 With regard to interest on the retainage, section 509(d) indicates that the court "shall" award interest if the defendant "unreasonably withholds acceptance of work or fails to pay retainage as required by this section." 73 P.S. § 509(d). The plain meaning of "unreasonable" includes "not governed or acting according to reason: evincing indifference to reality or appropriate conduct[.]" WEBSTER'S THIRD NEW INT'L DICTIONARY 2507 (1966). Conversely, "reasonable" means "being in agreement with right thinking or right judgment[.]" *Id.* at 1892. The record in the instant case reveals that Ravin specified what heaters it wanted above the bleachers, that Burley assured Ravin that these heaters worked well in his rink, that Ravin hired Ruthrauff to procure and install the specified heaters in accordance with Ravin's drawings, based on Burley's design, and that Ravin did not contract with Ruthrauff for design engineering services with regard to this project. After the project was completed, Ruthrauff unsuccessfully attempted to appease Ravin with regard to their dissatisfaction with the heaters that Ravin chose and directed Ruthrauff to install. Additionally, Burley and/or Burley's employees later conceded that they did not use the heaters at their rink after all because, contrary to their initial pronouncements, the heaters did not actually work well. Despite this, Ravin appears to have placed blame on Ruthrauff for failing to *sua sponte* design or install the U-tube configuration ultimately recommended by the manufacturer in 2002. These circumstances reveal that Ravin unreasonably withheld acceptance of work that they specified in the first place. Based on this record, and recognizing that

the underlying purpose of the Act to, *inter alia,* protect subcontractors, we conclude that Ravin's withholding of the retainage was unreasonable, as per the plain meaning of that word, and we remand to the trial court to determine the amount of interest due on the retainage in accordance with section 509(d) of the Act.

¶ 44 Determining whether the retainage was wrongfully withheld by Ravin for purposes of assessing applicability of the penalty provision is another matter. 73 P.S. § 512(a). As indicated above, a court "shall" award a "penalty equal to 1% per month of the amount that was wrongfully withheld" by a contractor who failed to comply with the Act's payment terms. *Id.* However, this section provides additional guidance with regard to defining what is "wrongfully withheld." Specifically, "[a]n amount shall not be deemed to have been wrongfully withheld to the extent it bears a reasonable relation to the value of any claim held in good faith by the owner, contractor or subcontractor against whom the contractor or subcontractor is seeking to recover payment." *Id.*

¶ 45 In the instant case, the trial court believed Murovich's testimony that he expected Ruthrauff to employ their HVAC expertise for a spot heating application. In other words, the trial court determined, as a matter of credibility, that Murovich held the retainage against Ruthrauff in good faith. We will not disturb this determination, given the deference afforded the trial court in its credibility determinations. Additionally, we will not disturb the trial court's determination that the amount retained bore a reasonable relation to the value of Ravin's claim, *i.e.,* an approximate 10% retainage, which is customary in the construction industry. Accordingly, upon remand, the trial court will not assess a penalty under section 512(a), as we affirm its decision denying this penalty.

¶ 46 With regard to attorneys' fees, the Act merely indicates that the "substantially prevailing party in any proceeding to recover any payment under this act shall be awarded a reasonable attorney fee in an amount to be determined by the court or arbitrator, together with expenses." 73 P.S. § 512(b). Upon remand, the trial court shall reassess this provision and make a determination with regard to whether Ruthrauff is a "substantially prevailing party in any proceeding to recover any payment" under the Act. Furthermore, if the court determines that Ruthrauff is the "substantially prevailing party" for these purposes, it shall determine a reasonable attorney fee to be awarded to Ruthrauff.

¶ 47 We now address the sole issue Ravin raises in its appeal. Ravin challenges the trial court's decision to award Ruthrauff $4,747.17 to compensate it for the additional work it performed after installation in an attempt to remediate Ravin's complaints. As mentioned above, Ruthrauff made a claim in its complaint against Ravin for unjust enrichment for the uncompensated work of rebuilding the heating units' burners in March of 2001, and for performing additional work on the units in June and August of 2001.

¶ 48 In concluding that Ravin was unjustly enriched by Ruthrauff's additional work, the trial court explained as follows:

The original contract ... contained a warranty, and although some of the work subsequently performed by Ruthrauff to correct the problems was work included under this warranty in the original contract, other subsequent work was not subject to the warranty provisions. Ruthrauff responded to at least three direct complaints from Ravin in regard to this problem, including a

response of altering the heating system. The Court finds that this additional work was completed. As a matter of equity, unjust enrichment and *quantum meruit,* the Court finds that Ruthrauff is entitled to an amount of $4,747.17 for this extra work. *Feingold v. Pucello,* 439 Pa.Super. 509, 654 A.2d 1093 (1995).

T.C.O. at 5. Ravin, in the instant appeal, inaccurately characterizes the court's decision. Ravin argues that the court erroneously determined that the uncompensated work was not within the one-year warranty *time period* agreed upon by the parties, and Ravin devotes several pages in its brief explaining how the record reveals that the work was performed within that one-year period. Ravin's brief at 18–20. However, the above excerpt reveals that the trial court based its decision on its finding that the remedial efforts, made by Ruthrauff to appease Ravin's complaints, were not included within the *scope* of the warranty, not the time period of the warranty. We agree with Ravin that the work was performed during the one-year warranty time period; however, Ravin presents no argument challenging the actual basis of the trial court's decision. "As in all matters on appeal, the appellant bears the burden of persuasion to demonstrate his entitlement to the relief he requests." *Rivera v. Pennsylvania Dept. of Corrections,* 837 A.2d 525, 528 (Pa.Super.2003). As Ravin presents no argument challenging the court's decision that the work was not within the scope of the warranty, Ravin fails in its burden of persuasion with regard to this argument.

¶ 49 However, Ravin argues alternatively that *Gee v. Eberle,* 279 Pa.Super. 101, 420 A.2d 1050 (1980), stands for the proposition that the existence of a written contract between the parties precludes a claim for unjust enrichment.[7] In *Gee,* a lender acquired property at a sheriff's sale after its mortgagor, the developer of the property, defaulted on a construction loan. Unpaid subcontractors sought payment from the lender on the theory of unjust enrichment. In *Gee,* we stated that where there is a direct relationship between parties "in the form of a promise either to the subcontractor or for the benefit of a contractor[,]" then the "subcontractor has a right to recover on the promise." *Gee,* 420 A.2d at 1060. However, "[t]he existence of that right ... precludes a claim of unjust enrichment." *Id.* Since the subcontractors in *Gee* had no right to assert payment premised on a promise from the lender, they could proceed on their unjust enrichment claim.

¶ 50 In the instant case, Ruthrauff made its claim for unjust enrichment for work it performed outside any promises made in the written contractual documents, *i.e.,* there were no contractual provisions for making the alterations to the heaters, which, furthermore, the trial court determined were outside the scope of the warranty in the contract. Indeed, the work for which Ruthrauff sought compensation under the theory of unjust enrichment was performed after Ruthrauff completed its contractual work at the Ice Castle. Accordingly, Ravin's reliance on *Gee* does not persuade us that the trial court erred in granting relief to Ruthrauff on its unjust enrichment claim.

¶ 51 Ravin also argues that a subcontractor's claim for unjust enrichment and *quantum meruit* is "allowed only against owners or lenders[,]" and cannot lie

---

**7.** Although Ravin raised this argument in its post trial motion, the trial court did not address it in its opinion.

against the general contractor. Ravin's brief at 21.[8] Ravin cites to *D.A. Hill Co. v. CleveTrust Realty Investors,* 524 Pa. 425, 573 A.2d 1005 (1990), and *Meyers Plumbing & Heating v. West End Fed.,* 345 Pa.Super. 559, 498 A.2d 966 (1985), in support of this proposition. However, these cases do not stand for the above proposition asserted by Ravin. Both cases examined situations in which subcontractors, who had contracted with a general contractor but who had sued owners or lenders for payment, could recover from the owners or lenders under the theory of unjust enrichment. Neither case stands for the sweeping proposition that a subcontractor is precluded from bringing a claim of unjust enrichment against a general contractor who is not the owner. Accordingly, Ravin has similarly failed in its burden of persuasion with regard to this argument.

¶ 52 For the foregoing reasons, we reverse the judgment entered in favor of Ravin on its $34,500.00 counterclaim. We reverse the trial court's denial of interest on the retainage under the Act and remand for calculation and entry of such interest in favor of Ruthrauff. We affirm the trial court's denial of a penalty on the retainage under the Act. We remand to the trial court for a determination of whether attorneys' fees and expenses should be granted under the Act, given the above modifications to the judgment. Finally, we affirm the trial court's decision in favor of Ruthrauff on its unjust enrichment claim, as Ravin has failed to persuade this Court that that decision was in error.

¶ 53 Judgment reversed in part and affirmed in part. Case remanded for proceedings in accordance with this Opinion. Jurisdiction relinquished.

¶ 54 Judge Tamilia concurs in the result.

---

**8.** Ravin raised this argument in its post trial motion, but the trial court did not address this point in its opinion.