J-A02009-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| CHARTER HOMES AT MILL CREEK, INC. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : | |
| CHARLAN GROUP, L.P. | : | No. 1113 MDA 2018 |
| Appellant | : | |
| v. | : | |
| CHARTER HOMES BUILDING COMPANY | : | |

Appeal from the Judgment Entered June 11, 2018
In the Court of Common Pleas of Lancaster County Civil Division at
No(s): CI-15-01375

BEFORE:  LAZARUS, J., DUBOW, J., and NICHOLS, J.

MEMORANDUM BY LAZARUS, J.:                    **FILED APRIL 26, 2019**

Charlan Group, L.P. ("Charlan"), appeals from the judgment entered in favor of defendant Charter Homes at Mill Creek, Inc., and additional defendant Charter Homes Building Company (collectively, "Charter Building"), following a bench trial, the Honorable Leonard G. Brown, III, presiding.  The underlying dispute between Charlan, a real estate developer, and Charter Building, a residential builder, arises out of a Lot Purchase Agreement ("Agreement") and the parties' subsequent oral modifications.  Following trial, the court entered

judgment in favor of Charter Building in the amount of $1,054,033.95.

Charlan filed this appeal, raising three issues:

> 1.      Did the trial court commit an error of law in failing to follow the requirements set out in [***Fine v. Checcio,***] 870 A.2d 850 (Pa. 2005),[1] when it determined an applicable statute of limitations was tolled?
>
> 2.      Did the trial court abuse its discretion in inferring an affirmative act of misrepresentation justifying a tolling of the statute of limitations?
>
> 3.      Did the trial court commit an error of law or abuse of discretion in not finding Charter Building was estopped from changing its acceptance that $8.6 million in Improvement Costs had been paid by Charlan?

Appellant's Brief, at 4.  After our review of the parties' briefs, the record and the relevant law, we affirm based on Judge Brown's August 6, 2018 Pa.R.A.P. 1925(a) order, which incorporates his comprehensive findings of fact and conclusions of law, filed on May 7, 2018.[2]

We first note our limited scope of review following a non-jury trial: During a non-jury trial, the trial court acts as the finder of fact and has the authority to make credibility determinations and resolve conflicts in evidence. ***Ruthrauff, Inc. v. Ravin, Inc.***, 914 A.2d 880, 888 (Pa. Super. 2006).  The court may believe all, part or none of the evidence.  ***Id.***

---

[1] In portions of its brief, Charlan refers to this case as "***Checo v. Fine***."  ***See*** Appellant's Brief, at iv, 10.

[2] We refer to the order and findings/conclusions as the court's May 7, 2018 opinion.

Issues of credibility and conflicts in evidence are for the trial court to resolve; this Court is not permitted to reexamine the weight and credibility determinations or substitute our judgment for that of the factfinder. Furthermore, the findings of the judge in a non-jury trial are given the same weight and effect as a jury verdict such that the court's findings will not be disturbed on appeal absent an abuse of discretion, error of law, or lack of support in the record. We will not disturb the court's factual findings merely on the basis we would have reached a different conclusion; rather, our task is to determine whether there is competent evidence in the record that a judicial mind could reasonably have determined to support the finding.

*Id.* at 887 (citations and quotations omitted).

The underlying facts are as follows: Charlan purchased undeveloped property in Lampeter Township, Lancaster County for $1.3 million, intending to develop it into a residential neighborhood. Charlan, which had a business relationship with Charter Building, entered into the Agreement with Charter Building pertaining to the development of the property, known as Mill Creek. The Agreement, dated September 19, 2002, contemplated that Charlan would complete the land improvements,[3] estimated at $8.6 million, and then sell the 237 lots to Charter Building.[4]

_____

[3] The improvements included, *inter alia*, installation of streets, sidewalks, walking paths, storm water management systems, site grading and street lighting. *See infra*, at n. 3.

[4] Mill Creek originally had five phases, but Phase 4 was eliminated because Charlan sold the land to Charter Building for $670,000.00. Charlan, therefore, was relieved of its obligation to complete the improvements associated with Phase 4.

Thereafter, disputes arose as to the duties and obligations of the parties under the Agreement. Charlan contended it was required to complete improvements up to $8.6 million, and that any additional required improvements would be the responsibility of Charter Building. Charter Building contended that if improvements cost less than $8.6 million, Charlan was required to remit one-half the savings to Charter Building, and if improvements cost more than $8.6 million, Charter Building and Charlan would evenly share the additional costs. Charter Building would pay its 50% share of the additional costs in 237 installments, as it purchased lots from Charlan.[5]

Further, according to Charter Building, the Agreement provided that, depending upon which pricing method was used (aggregate-sum pricing or fixed-price method), Charter Building might be obligated to pay an additional amount for the purchase of each lot if the improvements totaled more than $8.6 million. In other words, Charter Building would be required to reimburse Charlan for one-half of the "excess" improvement costs if the aggregate-sum pricing method were used. If the fixed-price method were used, then Charter Building would have no obligation to reimburse Charlan for any portion of the improvement costs overruns. At trial, Charlan's representative testified that Charter Building was responsible for 100% of the costs in excess of $8.6 million, regardless of which method was used.

_____

[5] As stated above, the development was to consist of 237 lots. ***See supra***, at p. 2.

In 2006, Charlan informed Charter Building that it had spent $8.6 million on improvement costs and thereafter claimed that it had exceed the Adjusted Improvement Costs Budget (AICB).[6]  Trial Court Opinion, *supra* at 10, citing N.T. Bench Trial, 1/4/18, at 90-92; N.T. Bench Trial, 1/5/18, at 183-84, 237. At the beginning of the 2008 housing crisis, sales of lots and homes in Mill Creek essentially ground to a halt, and Charlan, which had a mortgage on the undeveloped property, was concerned about foreclosure.  Charlan was no longer in a position to continue paying for improvements in accordance with the Agreement.  Thus, Charter Building agreed to pay for improvements with the understanding that, once the economy improved and sales picked up, Charlan would reimburse Charter Building for one-half the costs in excess of the AICB.

Between 2008 and 2010, the height of the housing crisis, only a few lots sold; zero lots sold in 2009 and only two lots sold in 2010.  In 2012, as the economy began to improve, lot sales began to pick up.

As of October 31, 2012, Charter Building provided an accounting to Charlan, showing that Charlan's share of the excess improvement costs beyond the AICB was $592,122.  Charter Building indicated to Charlan that it would accept $325,000 in settlement of $592,122 amount.  Charlan, in a May 15, 2013 email to Charter Building, agreed to "reimburse" Charter $325,000. Charter presented Charlan with an Amendment to the Agreement,

_____

[6] The cost of Phase 4 improvements that Charlan was not required to complete was $605,576.24; $8.6 million less that amount is the AICB - $7,994,423.76.

memorializing this agreement, but Charlan never signed it. *See* Trial Court Opinion, *supra* at 9, 25; N.T. Bench Trial, 1/4/18, at 72-73.

In July 2013, Charlan instructed its Comptroller, Julie Landis, to shred the last seven (7) years of invoices relating to Mill Creek, thus destroying documentation of what Charlan allegedly spent on improvements in 2005 and earlier. *See* Order, 6/11/18 (amending findings of fact). In a September 4, 2013 email from Charlan to Charter Building, Charlan stated that it was obvious the parties "can't work this out. You have our last offer so do what you feel you need to." Email from Doug Desmond [of Charlan] to Rob Bowman [of Charter Building], 9/4/13, Charlan's Exhibit 29.

On February 13, 2015, Charter Building filed suit against Charlan, alleging breach of contract and related claims, and seeking to recover improvement costs pursuant to the Agreement. Charter Building filed an amended complaint on April 10, 2017, based on post-complaint discovery, that Charlan had not actually reached the AICB amount (of $7,994,423.76).

In its complaint, Charter Building alleged that after the Agreement was signed, "Charlan did not have the funds to pay for all of the Improvements and requested that [Charter Building] pay for the Improvements." Complaint, 2/13/15, at ¶ 20. Charter Building also alleged that Charlan assured it "that it would reimburse [Charter Building] for the amount it had to spend to complete the Improvements up to the $8.6 million threshold[, and o]nce the costs exceeded $8.6 million, Charlan would reimburse [Charter Building] for half the amount spent by [Charter Building] thereafter." *Id.* at ¶ 21. *See*

***also id.*** at ¶ 33. In reliance on Charlan's promise, Charter Building averred that it incurred costs in the amount of $1,246,891.00. ***Id.*** at 22.

Charter Building claimed that it had agreed to use its own funds for improvements, "based on its expectation and the understanding between [the parties] that Charlan would reimburse [Charter Building] for one hundred percent of the amount it spent up to the $8.6 million specified in the Agreement, and fifty percent of the amount spent by [Charter Building] above and beyond the $8.6 million threshold specified in the Agreement." ***Id.*** at ¶ 29. Further, Charter Building averred that "Charlan failed to pay for the first $8.6 million in Improvements Costs and [Charter Building] was required to pay for some of the Improvements that were clearly Charlan's responsibility." ***Id.*** at 34.

Robert P. Bowman, President of Charter Building, testified why it was Charter Building's position that Charlan had not paid the threshold $8.6 million in improvement costs:

> [W]hen we asked for information, backup, this detailed report was provided, say, I think a handful of invoices. There is no – primarily no backup to this document. All we really have are these headings, what we assume are costs are under those headings that were spent at Mill Creek. But if I were just to take out the ones that are not improvement costs, the number falls dramatically from totals that are here to an amount that we believe were paid for improvement costs. So those are two reasons I believe that they didn't hit that. One, I don't have any verification of whether there were Mill Creek invoices or not. The second point is that the typical improvement costs which are contemplated under the [A]greement, there are a lot of costs on this list that aren't considered improvement costs.

N.T. Bench Trial, 1/4/18, at 91. Additionally, Bowman testified that he first came to the conclusion that Charlan had not paid $8.6 million in improvement costs "[a]fter we got this detailed summary," which was in response to a discovery request, after the original complaint had been filed in 2015. *Id.* at 92-93. He clarified that between 2007 and 2015, he had no reason to doubt that Charlan had paid $8.6 million in improvement costs, because George Desmond, general partner of Charlan, with whom he had had a business relationship since 1999, had told him so. *Id.* at 92 ("George told me $8.6 million and I believed him."). At trial, Charlan admitted that the Agreement stated that it was required to complete all improvements shown on the development plans.[7]

_____

[7] The Agreement provides, as follows:

**5. RESPONSIBILITIES OF SELLER AND BUYER**

Seller [Charlan] shall be responsible for completion of all improvements required in connection with the Land Use Plan, recorded Subdivision Plan or Plans, and other plans submitted to and approved by all governmental entities having jurisdiction thereof (hereinafter collectively referred to as the "Development Plans"), in accordance with all requirements of all governmental entities having jurisdiction thereof, including all grading, streets, curbs, storm water system (excluding individual Lot storm water detention facilities, if any), common facilities including (but not limited to) the neighborhood center, recreational facilities, walking path, street lighting, common area landscaping, and public water and sanitary sewer lines, underground electric, telephone and other required utilities.

Following trial, the court issued findings of fact and conclusions of law. In particular, the court found as follows:

1.  Charlan spent a total of $7,052,519.88 on Improvements;

2.  Charter Building incurred costs of $1,166,164.02 for Improvements;

3.  The total Charlan and Charter Building spent on Improvement Costs is $8,218,683.90;

4.  Charlan was solely responsible for paying the Adjusted Improvement Costs Budget of $7,994,423.76;

5.  The difference between the $8,218,683.90 and the Adjusted Improvement Costs Budget of $7,994,423.76, is $224,260.14;

_____

Lot Purchase Agreement, 9/19/02, at § 5.  The Agreement also provided that in the event the improvements totaled less than $8.6 million, Charlan would pay half of the difference/savings to Charter Building:

**6. COSTS OF SELLER RESPONSBILITIES AND BUYER CREDIT**

Seller's [Charlan's] direct costs for the responsibilities of Seller as forth in Section 6 of this Agreement, including the development of all phases of Mill Creek, are estimated to total Eight Million Six Hundred Thousand and no/100 Dollars ($8,600,000.00) ("Improvement Costs"). . . . Upon the completion of the responsibilities of [Charlan] as set forth in Section 5 of this Agreement, if the Improvement costs shall be less than Eight Million Six Hundred Thousand and no/100 Dollars ($8,600,000.00), [Charlan] shall pay to [Charter Building] one half of the difference between the final Improvement Costs and Eight Million six Hundred Thousand and no/100 Dollars ($8,6000,000.00).

*Id.* at ¶ 6.

6. Under section 3(a)(ii) of the Lot Purchase Agreement, Charter Building had to pay 50% of the Improvement Costs in excess of the budget to Charlan.[8] This amounted to $112,130.07; [and]

7. Since Charter Building had paid $1,166,164.02 for Improvements in place of Charlan, when it was only supposed to have paid $112,130.07, Charlan owed Charter Building the difference, which amounted to $1,054,033.95.

Trial Court Opinion, 5/7/18, at 12, 22-23. As noted above, the court entered judgment in favor of Charter Building for $1,054,033.95. Charlan filed a post-trial motion on May 17, 2018 and this timely appeal followed.

_____

[8] Section 3(a)(ii) of the Agreement provides:

a. For all Lots, [Charter Building] shall pay to [Charlan] as the Purchase price for each Lot[:]

    ii.    The aggregate sum of:

        (1)    Twenty Three percent (23%) of the Base Price of each home and Lot sold by [Charter Building] as Builder to a Homebuyer; and

        (2)    Fifty percent (50%) of the Lot Premium, if any, paid by the Homebuyer; and

        (3)    Fifteen percent (15%) of the price of Options incorporated into the home sold by [Charter Building] as Builder to the Homebuyer, and

        (4)    In the event that Improvement Costs (as defined in Section 6 of this Agreement exceed the sum of $8,600,000, one two hundred thirty sevenths (1/237) of fifty percent of the difference between the total Improvement costs and $8,600,000.

Lot Purchase Agreement, ***supra*** at 3(a)(ii).

We address Charlan's first two claims together. Charlan argues the court erred in finding that the statute of limitations[9] was tolled and in inferring that Charlan misrepresented that it had paid $8.6 million in improvement costs. Charlan argues that Charter Building's cause of action accrued in 2006, when Charlan first told Charter Building that it had satisfied the relevant portion of the Agreement. *See* Trial Court Opinion, *supra* at 7, 10. Charlan claims that Charter Building's 2015 lawsuit, amended in 2017, is time-barred as to the contract claim, and that the trial court erred in allowing the discovery rule to toll the statute, thereby improperly increasing Charter Building's damages. Charlan relies on *Fine*, *supra*, to support its argument.

In *Fine*, the Court stated "the discovery rule applies to toll the statute of limitations in any case where a party neither knows nor reasonably should have known of his injury and its cause at the time his right to institute suit arises." *Id.* at 859. Charlan is not entitled to relief under *Fine*.

The trial court found that Charlan told Charter Building in "approximately 2006," and "[i]n late 2007," that it had spent $8.6 million improvement costs and thereafter consistently claimed it had exceeded the AICB. *See id.* at 7, 10. Charlan produced a document entitled "Job Transaction Detail Report," which listed costs Charlan purportedly incurred at Mill Creek; however, Charlan produced no invoices, bills, payments requests, checks or evidence to support its claims, contending all documentation from

---

[9] Pennsylvania's statute of limitations requires lawsuits upon a contract to commence within four years. *See* 42 Pa.C.S.A. § 5525(a).

2005 and earlier was destroyed in 2013. *See* Order, 6/11/18 (amending findings of fact). Since Charlan destroyed its evidence, and presented no evidence in support of its claims, the trial court, sitting as finder of fact, found its witnesses not credible. The court found Charter Building credibly testified that it was never provided with detailed invoices for amounts it was charged by Charlan for improvements prior to 2008. *See* N.T. Bench Trial, 1/4/18, at 91-93 (Testimony of Robert Bowman).

Significantly, the court concluded that Charter Building's cause of action against Charlan arose on September 4, 2013, when Charlan indicated it would not be paying the previously-agreed reimbursements (for improvements paid for by Charter Building during the height of the housing crisis). Further, Charlan indicated that if Charter Building would not accept reimbursement in lots, Charlan essentially invited Charter Building to file suit, "[D]o what you feel you need to." Charter Building then filed its suit on February 13, 2015, within the four-year statute of limitations.

As the court reasoned, "it is not unusual for a party to agree to pay money on another's behalf based on agreement that the debt will be repaid at an unspecified later time." Trial Court Opinion, *supra* at 23. Here, the court concluded that Charlan's "obligation to repay the debt" arose, based on the facts and circumstance here, "when the housing market rebounded." *Id.* at 23-24. In particular, it was not until after Charter Building filed suit and it obtained Charlan's Job Transaction Detail Report, that Charter Building's claim for the excess improvement costs accrued. The court determined that Charter

was previously unaware that Charlan "did not actually incur costs up to the [AICB] as Charlan told Charter Building in 2006 that it had spent $8.6 million and thereafter consistently claimed that it had exceeded the [AICB]. *Id.* at 24, citing N.T., 1/4/18, at 90-92, N.T. 1/5/18, 183-84, 237. Thus, the court concluded, Charter Buildings' claim for Charlan's share of the excess improvement costs was timely. *Id.* at 24.

We also find Charlan's argument that the court erred in "inferring an affirmative act of misrepresentation" to justify tolling the statute of limitations, misplaced. The trial court based its conclusion on the discovery rule-- that the statute was tolled because Charter Building did not know, or could not reasonably have known, of its damages until (a) Charlan indicated it would not reimburse Charter, and (b) Charter Building received Charlan's Job Transaction Detail Report after the original complaint was filed. Charlan's attempt to cast the trial court's tolling of the statute as based on a "finding" of misrepresentation, is a red herring. Fraudulent concealment is a separate ground that may toll a statute of limitations. Charlan attempts to conflate the two, arguing that a showing of fraud is required in order for the court to apply the discovery rule to toll the statute. Fraud need not be shown in order for a party to invoke the discovery rule. As we noted in *Gustine Uniontown Assocs., Ltd. v. Anthony Crane Rental, Inc.*, 892 A.2d 830 (Pa. Super. 2006):

> The discovery rule is distinct from the issue of whether a party is equitably estopped from invoking the statute of limitations. *Fine v. Checcio*, 582 Pa. 253, 870 A.2d 850 (2005). The discovery

rule operates to toll the statute of limitations during the period the plaintiff's injury or its cause was neither known nor reasonably knowable to the plaintiff. *Id.* The separate doctrine of fraudulent concealment tolls the statute based on an estoppel theory and provides that a defendant may not invoke the statute of limitations if through either intentional or unintentional fraud or concealment, the defendant causes the plaintiff to relax his vigilance or deviate from his duty of inquiry into the facts. *Id.* Thus, the former doctrine involves a plaintiff's lack of knowledge and the latter doctrine pertains to a defendant's conduct after the cause of action arose.

*Id.* at 835.n.2.

Here, the court did not make a finding of misrepresentation; it determined that the discovery rule applied. As the record supports the trial court's findings, we find no error. *See Gleason v. Borough of Moosic*, 15 A.3d 479 (Pa. 2011) (where complaining party is reasonably unaware that his or her injury has been caused by another party's conduct, discovery rule suspends, or tolls, running of statute of limitations). *See also Ruthrauff*, *supra* at 888; *John B. Conomos, Inc. v. Sun Co., Inc.*, 831 A.2d 696, 703 (Pa. Super. 2003) (our task is to "determine whether there is competent evidence in the record that a judicial mind could reasonably have determined to support the finding.").

Charlan's final claim, that the court erred in not finding Charter Building was estopped from changing its "acceptance that $8.6 million in Improvement Costs had been paid by Charlan," is waived. Charlan did not raise this claim in its May 17, 2018 motion for post-trial relief. *See Chalkey v. Roush*, 805 A.2d 491, 496 (Pa. 2002); Pa.R.C.P. 227.1.

We, therefore, affirm the judgment entered in favor of Charter Building, and we direct the parties to attach a copy of Judge Brown's comprehensive opinion in the event of further proceedings in this matter.  *See* Pa.R.A.P. 1925(a) Order, 8/6/18; Findings of Fact/Conclusions of Law, 5/7/18.

Judgment affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>4/26/2019</u>