J. S64035/15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| GEORGIA L. SCHMOOK, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| MICHAEL L. RUSSELL, | : | |
| | : | No. 694 MDA 2015 |

Appeal from the Order Entered March 25, 2015
In the Court of Common Pleas of Lancaster County
Civil Division No(s).: CI-06-09100

BEFORE: FORD ELLIOTT, P.J.E., WECHT, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:                **FILED DECEMBER 22, 2015**

Appellant, Georgia L. Schmook ("Wife"), appeals from the order entered in the Lancaster County Court of Common Pleas, denying her petition for special relief that alleged Appellee, Michael L. Russell ("Husband"), breached their post-nuptial agreement.[1]  Appellant argues: (1) the court's finding that Husband cooperated with the listing agent for the sale of the marital home was against the weight of the evidence; and (2) the court erred in finding it could not modify the agreement under 23 Pa.C.S. § 3105(c), where Section 3105 allowed it to enforce the agreement.[2]  We

---

[*] Former Justice specially assigned to the Superior Court.

[1] Husband filed a *pro se* appellee's brief in this appeal.

[2] For ease of disposition, we review Wife's issues in reverse order.

affirm.

The parties were married in 1993.[3]  On September 18, 2006, Wife filed a complaint in divorce.  Seven years later, on September 4, 2013, the parties executed the underlying post-nuptial agreement ("PNA"),[4] which provided in pertinent part:

> The marital home located at 9 Longenecker Road, Lititz, Lancaster County, Pennsylvania is titled in the name of Wife and Husband.  The property is currently listed for sale. **Both Wife and Husband shall cooperate fully with the listing agent for a sale to occur.**  Husband agrees to keep the home in good repair as he is currently living in the home while it is being sold.  Upon sale of the property Wife will receive $78,000.00 of the proceeds and Husband will receive the remainder of the proceeds.  At the time of settlement, the settlement agent is directed to provide a check to Wife and a check to Husband as set forth above.  **Both Wife and Husband shall sign any documents necessary to insure the sale of the home at the legally appropriate time.**

Post Nuptial Agmt. at 2 (emphases added).  The PNA "was not incorporated

---

[3] Following the divorce complaint, there was no activity on the docket for more than two years, prompting the trial court to issue notice on November 24, 2008, of its intent to terminate the matter because of lack of activity. Wife responded by filing a statement of intent to proceed.

The parties have three children, two of whom were minors as of February 2009.  Wife's Aff. re Vital Statistics, 2/27/09, at 2-3.  At the time Wife filed her statement of intent to proceed, the parties and the two younger children were living together in the marital home.

[4] In executing the PNA, Wife was represented by Rebecca Cheuvront, Esq., and Husband proceeded *pro se*.  The agreement divided the parties' property and provided that both parties waived spousal support, alimony, and alimony pendent lite.  Attorney Cheuvront represented Wife in all stages of this matter, including the instant appeal.

by reference or merged into the divorce decree; nor [did] it contain any terms which permit judicial modification." Trial Ct. Findings of Facts & Concl. of Law, 3/25/15 ("Trial Ct. Findings"), at ¶ 16. On September 27, 2013, the parties were divorced.

The trial court made the following findings of fact with respect to the parties' efforts to sell the marital home. The house was listed for sale in July of 2013 with a price of $344,900, and subsequently a reduced price of $327,500. "Husband prepared the home for showings, maintained the home and made improvements per the Listing Agent's suggestions." *Id.* at ¶ 6.

In September 2014, approximately fourteen months after the house was listed, the parties received an offer of $315,000, which they accepted. "On October 14, 2014, after receiving the inspection report, the [buyers] made a written corrective counterproposal . . . requesting that the parties make repairs, at their own expense, as follows: (1) employ Mowrer's Construction to repair leaking windows and damage," the "[c]urrent estimate" for which was $4,200, "unless additional unforeseen damage has occurred;" (2) repair roof issues; and (3) repair a leak in the furnace. *Id.* at ¶ 8.

> 9. Husband refused to accept the [buyers'] counterproposal, and made a verbal counterproposal . . . to the listing agent [of] a $3,000 credit at settlement.[5]

---

[5] Our review of the hearing transcript reveals the sole reference to a $3,000 figure was made as follows. On cross-examination, Husband testified with respect to the buyers' offer:

10. Wife ultimately offered to provide [$4,200] to complete repairs. . . .

11. [H]usband was out of town and difficult to reach, and, when [W]ife was finally able to contact [H]usband on Sunday, October 19, 2014, the parties began their own negotiation regarding acceptance of the counterproposal, but they were unsuccessful in coming to consensus[.]

12. Consequently, the counterproposal was not signed by the deadline, and the sale fell through, as the Buyers signed a Release [that day,] on October 19, 2014.

13. As the listing agreement had already expired, the parties then began to struggle to agree on a new listing agent, as well as terms associated with same; this continued on until November 18, 2014, when [Wife] presented a Petition for Special Relief[,] requesting that [Husband] be found in breach of the Postnuptial Agreement for not having fully cooperated with the listing agent for a sale to occur, and for not signing a document necessary to ensure the sale of the home at the legally appropriate time, namely the buyers['] written . . . counterproposal with [Wife] agreeing to provide [$4,200] in repair costs.

*Id.* at 3.

The relief requested in Wife's petition was "the ability to solely communicate with and sign documents related to the listing and sale of the

---

. . . I was at $320,000. I said, that's my bottom line.

And then what happened is I [told the listing agent that if Wife is] willing to throwing anything in . . . have her put in $1, then I will come down to the 315. She agreed to put in $3,000 of that last 5,000 and that's why price went from 320 to 315. . . .

N.T. at 63.

marital home and ultimately the ability to sign any agreement of sale, and related documents, so that clear title can be conveyed to third party buyers." Wife's Pet. for Special Relief, 11/18/14, at ¶ 7.[6] Wife also requested an order directing the home to "be immediately placed back on the market," as well as attorney's fees and expenses. *Id.*

On December 3, 2014, the court issued an order directing the marital home be listed "at the agreed upon amount of $327,900." Order, 12/3/14. The court conducted a hearing on Wife's petition on January 20, 2015, at which the sole witnesses were Wife and Husband.[7] As Wife's issues on appeal concern the weight of the evidence for the court's finding that Husband did not breach the PNA, we review the relevant testimony in detail.

Wife testified the sale "agreement was signed," but the buyers additionally requested "a seller's assist." N.T. at 12, 13. She set forth the timeline of events as follows:

> It started on a Friday afternoon with the addendum [of the buyers requesting repairs or a seller's assist. Husband] told the agent that he would give him an answer on Sunday at 5.
>
> So went through the whole weekend with [the] buyers

---

[6] While Wife's petition is included in the certified record, there is no entry on the trial docket for this filing. We rely on the trial court's statement that the petition was filed on November 18, 2014. *See* Trial Ct. Findings at ¶ 13.

[7] Both parties were represented by counsel at the hearing. At the time of the hearing, Husband was living at the marital home. N.T. Divorce H'rg, 1/20/15, at 35.

> wanting this house and not knowing what's happening with the addendum so I finally—I said to [the listing agent] that I'll take the $4200 and pay it, and [Husband] would not sign . . . the addendum.
>
> . . . The agreement of sale was signed but [Husband] would not still sign the addendum even though he wasn't going to have to pay that $4200. I was going to.
>
> Then that went till Sunday night and then [the agent] called me back and said, well, [Husband] now will sign the agreement but he wanted [a particular piece of stained glass that was in her possession] and I said, okay.

*Id.* at 12-13.

Wife explained why she agreed to Husband's request for the stained glass: "I just want to get this house sold. We can't let a deal fall through. It's been two years. We need to get this house sold." *Id.* at 14. She further testified,

> I wasn't at home right then. I [told Husband,] meet me at the house[8] at 8:30, I'll be home. He said, okay.
>
> I got to the house, I said, I'll give you the stained glass, you can—you sign the addendum. He did not come to the house. Then he texted me and said he was sleeping, put the stained glass on the porch at [the marital home].
>
> [A]t that point, it was 9:00 or after 9. I wasn't going to go take a huge piece of stained glass over to [the marital home] and put it on the porch.
>
> [T]he addendum did not get signed and the next morning . . . the buyers signed a release to get out of the agreement[.]

---

[8] Wife did not explain which house she was referring to; by context we presume she meant her own house.

*Id.*

Wife further testified that at the time of the hearing, there was an offer of $315,000 to purchase the house, a price she would agree to.[9] *Id.* at 16, 20. Wife requested a court order granting her "authority to sign documents for a sale of [$315,000] and higher," stating:

> I don't trust that if I don't have something in writing that—who knows. [Husband] might be able to just take it off the market again or when this listing runs out, maybe it doesn't get relisted or who knows. . . .

*Id.* at 21.

Husband testified to the following. He works as a mortgage originator for M & T Bank. *Id.* at 35, 36. Husband would likewise "like to move on" and "get the house sold." *Id.* at 41. The terms of the PNA, including Wife's receipt of $78,000 from the proceeds of the sale of the house, were based on "recommendations from several realtors that the house would sell rapidly at" $344,900. *Id.* at 39, 62. Husband, however, subsequently agreed to a reduced price of $327,900, although it would result in reduced proceeds to him, as Wife "was not willing to accept a fair reduction in her $78,000 net proceeds." *Id.* at 39-40.

Husband testified to the following concerning the rejected offer. He signed an agreement for a sale price of $315,000, contingent on the buyers'

---

[9] Wife also stated that a sale agreement did not list her as a seller. N.T. at 19-20.

inspection. The buyers' radon testing "had to be done twice," and Husband allowed them "to place the machine in the basement for three . . . or four days" and retest. *Id.* at 47. By that Friday afternoon, Husband rejected the buyers' subsequent counteroffer to repair the windows, gas leak, and other items, reasoning, "[W]e already reduced our price" "[d]own to [$315,000] and they can buy the house as is." *Id.* at 48-49. He then told the listing agent he was going to Maryland, would not have email or cell phone service, and would return on Sunday. *Id.* at 48. Husband emphasized that Wife offered to pay the $4,200 **after** the buyers executed the release to terminate the transaction. *Id.* at 49.

On cross-examination, Husband further testified to the following. He denied that Wife told him on the Friday afternoon that she would personally pay the $4,200. *Id.* at 56-57. On Sunday, Wife asked him through text messages whether he would sign the addendum. Husband "had no clue what was being referred to as the addendum because" on Friday he had informed the agent "we're done negotiating." *Id.* at 53. At this time on Sunday, he was not aware Wife and the agent had offered to pay the buyers $4,200, and instead, he was "under the impression that [the buyers] had accepted [his] offer from Friday afternoon, that [he and Wife] would pay no more repairs and they would accept the property as is." *Id.* at 57. "By [the] time" Husband checked his email at 6:30 or 7:00 Sunday evening, "the release had already been signed by the buyers." *Id.* at 54.

With respect to the stained glass, Husband stated he was entitled to that personal property under the PNA and Wife previously agreed she would return it to him, "[b]ut on several occasions when [he] asked [to] come over and [retrieve it,] she refused." *Id.* at 55. On that Sunday night, Wife "said [he] could have the stained glass," and Husband "told her to put it on the front porch." *Id.* Although Wife offered to return the glass if he signed the agreement, in his estimation their conversation about the stain glass did not relate to the sale of the house, as "[b]y that time, the deal was dead." *Id.* The following exchange occurred on cross examination:

> [Wife's counsel:] But ostensibly everyone had until midnight so they may have signed the release but you still had the viability of resurrecting this contract with [Wife] paying $4200. You did. You had until midnight that night.
>
> [Husband:] That was never explained to me, number one. And number two, when you're saying the contract I'm referring to, I'm referring to the Friday afternoon when I told [the listing agent] I was done. We already knocked [$]12,500 off. [The buyers] could buy the house as is, they could get whoever they wanted to do the repairs.
>
> Q. If you thought all of that was true, sir, then why in the world would you enter into an agreement with [Wife] that if she gave you a piece of glass, you would go ahead and sign?
>
> A. Because I wanted my piece of glass that she took from my possession.
>
> Q. So you were essentially going to commit a fraud, get her to give you something when you had no intention of—
>
> A. I was willing to sign the document.

Q. And that document—

A. It was already done at that point. It was a done deal at that point. The game was over.

*Id.* at 58-59.

With respect to the upkeep of the home, Husband testified to the following. "[T]he house was a little dated," and thus Husband stripped wallpaper, repainted three bedrooms, painted the exterior trim, and in the summer, mowed the lawn and pulled weeds. *Id.* at 43, 51. Wife "only [returned] to the house once . . . to do about two hours worth of painting in a bedroom" and the remainder of the work was performed by Husband or by someone whom he paid. *Id.* 45. There have been five open houses and eleven showings, and Husband believed he cooperated with the listing agent. *Id.* at 41, 44. He "never denied a listing, . . . an open house, [or] a showing and . . . always had the property ready for each event." *Id.* at 42.

Finally, Husband testified that while he accepted the September 2014 offer of $315,000, as of January 2015 hearing, he would no longer agree to this price because "the housing market has changed drastically since that time," "[t]he number of buyers . . . in the market has decreased drastically," mortgage interest rates were "as low as [3.25%] on a 30-year fixed rate mortgage," which was more than "a point lower than they were at that time." *Id.* at 50. Additionally, Husband emphasized that the PNA's provision that he "cooperat[e] fully with the listing agent" did not require him "to accept any offer or counteroffer." *Id.* at 39, 46.

Following the parties' testimony, the trial court declined to award attorneys' fees to either party and stated its finding that neither party "is intentionally in breach of the post nuptial agreement," and that their "attempts at negotiating, given the change in circumstances, are [in] bad faith." *Id.* at 74, 75-76. The court encouraged the parties to reach an agreement, and advised that if they could not, "[T]hen you're stuck with what you've signed and written as far as I can tell." *Id.* Nevertheless, the court allowed the parties two weeks to present proposed findings of fact and conclusions of law as to whether the court could "add certain parameters to [the] agreement," as suggested by Wife.[10] *Id.* at 75.

On March 23, 2015, the court issued the above findings of fact and an order dismissing Wife's petition. The court reiterated its finding that "[c]ontrary to [Wife's] claim, both parties have cooperated fully with the listing agent for a sale to occur," and "that neither party has willfully breached any provision of the Postnuptial Agreement which would entitle the

---

[10] The court noted Wife's request "to require a sale at a certain price . . . and request that she be entitled to . . . sign all documents necessary to accomplish that." *Id.* at 75. It remarked, "Ultimately, the agreement itself [does not include and thus] leaves very open [the] terms of the sale prices[.]" *Id.* at 74.

On appeal, Wife's brief responds to the court's "findings [concerning] deficiencies in the" PNA. Wife's Brief at 12. She states that although Attorney Cheuvront drafted the original PNA, the parties themselves revised and executed the agreement, and " the record does not refer to . . . what role counsel played in the ultimate agreement." Wife's Brief at 9, 12-13.

other to attorney's fees and cost." Trial Ct. Findings at ¶¶ 14-15. Furthermore, the court found that because the PNA did not provide for "judicial modification of the agreement," the court lacked authority under 23 Pa.C.S. § 3105(c) to modify the terms of the PNA. *Id.* at ¶¶ 16-17. Wife took this timely appeal.

On appeal, Wife's first claim is that the trial court's finding—that Husband cooperated with the listing agent for the sale of the house—was against the weight of the evidence.[11] In support, she avers the following. The house was listed for sale for two years with "little to no interest in the home." Wife's Brief at 21. The one offer in October 2014 for $315,000 "was not acceptable to Husband, as the buyers wanted [a] seller's assist." *Id.* "In an effort to keep the sale alive Wife agreed to pay the seller's assist, which caused Husband to agree to the sale, so long as Wife provided him with a piece of stained glass that was not mentioned anywhere in the Agreement." *Id.* "[T]he only thing holding up settlement was Husband not signing the addendum, despite the fact Wife assumed the $4200 in seller's assist." *Id.* at 22. "Text messages entered into evidence . . . show

---

[11] Wife's argument on this issue, consisting of less than two and a half pages, included no legal authority. We remind counsel, "Failure to develop an argument with citation to, and analysis of, relevant authority waives that issue on review." *Harris v. Toys "R" Us-Penn, Inc.*, 880 A.2d 1270, 1279 (Pa. Super. 2005) (citing Pa.R.A.P. 2119(b)). Nevertheless, in light of the relatively short hearing transcript and the court's findings of fact, in this particular case we decline to find waiver of Wife's issue.

Husband's agreement with the sale at $315,000.00, and were inconsistent with his sworn testimony." *Id.* Testimony at the hearing "established [there was] a second offer . . . at the lower price, and another interested party was viewing the home for a second time;" however, "[n]one of these prospective buyers was offering Husband's arbitrary value of $327,500.00." *Id.* at 22. "Because the Trial Court held it did not have authority to modify terms of the post nuptial agreement . . . Wife requests that this matter be remanded to the Trial Court for a hearing . . . , consistent with the law." *Id.* at 22-23. We find no relief is due.

"Where . . . a property settlement agreement did not merge into the divorce decree, it stands as a separate contract, is subject to the law governing contracts, and is to be reviewed as any other contract." *Mazurek v. Russell*, 96 A.3d 372, 378 (Pa. Super. 2014) (citation omitted). With respect to a claim of breach of contract, this Court has stated:

> [W]ith regard to factual determinations, the trial court acts as the factfinder in a bench trial and may believe all, part or none of the evidence presented. Issues of "credibility and conflicts in evidence are for the trial court to resolve; this Court is not permitted to reexamine the weight and credibility determinations or substitute our judgment for that of the factfinder." Furthermore, "the findings of the judge in a non-jury trial are given the same weight and effect as a jury verdict such that the court's findings will not be disturbed on appeal absent an abuse of discretion, error of law, or lack of support in the record." We will not disturb the court's factual findings merely on the basis we would have reached a different conclusion; rather, our task is to "determine whether there is competent evidence in the record that a judicial mind could reasonably have determined to support the finding."

***Ruthrauff, Inc. v. Ravin, Inc.***, 914 A.2d 880, 888 (Pa. Super. 2006) (citations omitted).

In its opinion, the trial court stated:

> Contrary to Wife's claim, the Trial court found that both parties cooperated fully with the listing agent for the sale to occur. The Trial court further found that neither party willfully breached any provision of the PNA which would entitle the other to attorney's fees and cost.

Trial Ct. Op., 6/18/15, at 3. It reasoned:

> At the hearing, Husband testified credibly and extensively regarding his efforts to cooperate with the listing agent and prepare the marital home for sale. [N.T. at 35-56.] Husband prepared the home for showings, maintained the home and made improvements per the Listing Agent's suggestions. On his own accord, he reduce[d] the sale price from $344,900.00 to $327,500.00. He also agreed to the sale of the home at the reduced price of $315,000.00[. ***Id.*** at 38-47.]
>
> The trial court found both parties to be credible in their testimony although testifying from different perspectives and interpretations of the circumstances. Both parties presented their evidence to support their interpretations, and the trial court found that neither party was in contempt of the PNA. [***Id.*** at 74. T]he trial court acted within its[ ] discretion in making such findings which were clearly not against the weight of the testimony and evidence.

Trial Ct. Op. at 7.

The parties' testimony, as we summarized above, revealed inconsistencies as to when Wife communicated her offer to personally pay $4,200 as a seller's assist and when the deadline for the parties to accept the buyers' counteroffer expired. The trial court was free to "believe all, part

or none of the evidence presented" and resolve any conflicts in evidence and credibility issues. *See Ruthrauff, Inc.*, 914 A.2d at 888. Furthermore, Wife's arguments, both in the underlying petition for special relief and in the instant appeal, focus solely on Husband's conduct on the weekend surrounding October 19, 2014 and rejection of the $4,200 seller's assist addendum. Wife does dispute Husband's testimony that—aside from two hours that Wife contributed—he singly renovated the home's appearance and, over the course of fourteen months, prepared the home for five open houses and eleven showings. *See generally* N.T. at 41-45, 51. Wife also does not address or dispute Husband's testimony that under the PNA, he was not required to accept any offer on the house. *See id.* at 39, 46. Accordingly, we find no basis to disturb the court's conclusion that Husband did not breach the PNA.

Wife's second argument on appeal is that the court misapprehended her petition as a request for the court to modify the PNA. Instead, she maintains, she "merely [sought] enforcement by way of economic justice" "of the provision which provides for the sale of real estate and for her to receive a sum certain." Wife's Brief at 16. Wife contends the court had authority to effectuate economic justice under 23 Pa.C.S. § 3105(a), 23 Pa.C.S. § 3104(a)(1) and (5), and 23 Pa.C.S. § 3323(f).

Because we uphold the trial court's determination that Husband did not breach the PNA, we need not reach this second issue, of whether the

court could or should have intervened to effect economic justice.

In light of the foregoing, we affirm the court's order denying Wife's petition for special relief.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/22/2015