J-A02009-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| CHARTER HOMES AT MILL CREEK, INC. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| CHARLAN GROUP, L.P. | : | |
| Appellant | : | No. 1113 MDA 2018 |
| | : | |
| v. | : | |
| | : | |
| CHARTER HOMES BUILDING COMPANY | : | |

Appeal from the Judgment Entered June 11, 2018
In the Court of Common Pleas of Lancaster County Civil Division at
No(s):  CI-15-01375

BEFORE:  LAZARUS, J., DUBOW, J., and NICHOLS, J.

MEMORANDUM BY LAZARUS, J.:                    **FILED APRIL 26, 2019**

Charlan Group, L.P. ("Charlan"), appeals from the judgment entered in favor of defendant Charter Homes at Mill Creek, Inc., and additional defendant Charter Homes Building Company (collectively, "Charter Building"), following a bench trial, the Honorable Leonard G. Brown, III, presiding.  The underlying dispute between Charlan, a real estate developer, and Charter Building, a residential builder, arises out of a Lot Purchase Agreement ("Agreement") and the parties' subsequent oral modifications.  Following trial, the court entered

judgment in favor of Charter Building in the amount of $1,054,033.95.

Charlan filed this appeal, raising three issues:

> 1. Did the trial court commit an error of law in failing to follow the requirements set out in [*Fine v. Checcio,*] 870 A.2d 850 (Pa. 2005),[1] when it determined an applicable statute of limitations was tolled?
>
> 2. Did the trial court abuse its discretion in inferring an affirmative act of misrepresentation justifying a tolling of the statute of limitations?
>
> 3. Did the trial court commit an error of law or abuse of discretion in not finding Charter Building was estopped from changing its acceptance that $8.6 million in Improvement Costs had been paid by Charlan?

Appellant's Brief, at 4.  After our review of the parties' briefs, the record and the relevant law, we affirm based on Judge Brown's August 6, 2018 Pa.R.A.P. 1925(a) order, which incorporates his comprehensive findings of fact and conclusions of law, filed on May 7, 2018.[2]

We first note our limited scope of review following a non-jury trial: During a non-jury trial, the trial court acts as the finder of fact and has the authority to make credibility determinations and resolve conflicts in evidence. *Ruthrauff, Inc. v. Ravin, Inc.*, 914 A.2d 880, 888 (Pa. Super. 2006).  The court may believe all, part or none of the evidence.  *Id.*

---

[1] In portions of its brief, Charlan refers to this case as "*Checo v. Fine*."  *See* Appellant's Brief, at iv, 10.

[2] We refer to the order and findings/conclusions as the court's May 7, 2018 opinion.

> Issues of credibility and conflicts in evidence are for the trial court to resolve; this Court is not permitted to reexamine the weight and credibility determinations or substitute our judgment for that of the factfinder. Furthermore, the findings of the judge in a non-jury trial are given the same weight and effect as a jury verdict such that the court's findings will not be disturbed on appeal absent an abuse of discretion, error of law, or lack of support in the record. We will not disturb the court's factual findings merely on the basis we would have reached a different conclusion; rather, our task is to determine whether there is competent evidence in the record that a judicial mind could reasonably have determined to support the finding.

*Id.* at 887 (citations and quotations omitted).

The underlying facts are as follows: Charlan purchased undeveloped property in Lampeter Township, Lancaster County for $1.3 million, intending to develop it into a residential neighborhood. Charlan, which had a business relationship with Charter Building, entered into the Agreement with Charter Building pertaining to the development of the property, known as Mill Creek. The Agreement, dated September 19, 2002, contemplated that Charlan would complete the land improvements,[3] estimated at $8.6 million, and then sell the 237 lots to Charter Building.[4]

---

[3] The improvements included, *inter alia*, installation of streets, sidewalks, walking paths, storm water management systems, site grading and street lighting. *See infra*, at n. 3.

[4] Mill Creek originally had five phases, but Phase 4 was eliminated because Charlan sold the land to Charter Building for $670,000.00. Charlan, therefore, was relieved of its obligation to complete the improvements associated with Phase 4.

Thereafter, disputes arose as to the duties and obligations of the parties under the Agreement. Charlan contended it was required to complete improvements up to $8.6 million, and that any additional required improvements would be the responsibility of Charter Building. Charter Building contended that if improvements cost less than $8.6 million, Charlan was required to remit one-half the savings to Charter Building, and if improvements cost more than $8.6 million, Charter Building and Charlan would evenly share the additional costs. Charter Building would pay its 50% share of the additional costs in 237 installments, as it purchased lots from Charlan.[5]

Further, according to Charter Building, the Agreement provided that, depending upon which pricing method was used (aggregate-sum pricing or fixed-price method), Charter Building might be obligated to pay an additional amount for the purchase of each lot if the improvements totaled more than $8.6 million. In other words, Charter Building would be required to reimburse Charlan for one-half of the "excess" improvement costs if the aggregate-sum pricing method were used. If the fixed-price method were used, then Charter Building would have no obligation to reimburse Charlan for any portion of the improvement costs overruns. At trial, Charlan's representative testified that Charter Building was responsible for 100% of the costs in excess of $8.6 million, regardless of which method was used.

_____

[5] As stated above, the development was to consist of 237 lots. **See supra**, at p. 2.

In 2006, Charlan informed Charter Building that it had spent $8.6 million on improvement costs and thereafter claimed that it had exceed the Adjusted Improvement Costs Budget (AICB).[6] Trial Court Opinion, **supra** at 10, citing N.T. Bench Trial, 1/4/18, at 90-92; N.T. Bench Trial, 1/5/18, at 183-84, 237. At the beginning of the 2008 housing crisis, sales of lots and homes in Mill Creek essentially ground to a halt, and Charlan, which had a mortgage on the undeveloped property, was concerned about foreclosure. Charlan was no longer in a position to continue paying for improvements in accordance with the Agreement. Thus, Charter Building agreed to pay for improvements with the understanding that, once the economy improved and sales picked up, Charlan would reimburse Charter Building for one-half the costs in excess of the AICB.

Between 2008 and 2010, the height of the housing crisis, only a few lots sold; zero lots sold in 2009 and only two lots sold in 2010. In 2012, as the economy began to improve, lot sales began to pick up.

As of October 31, 2012, Charter Building provided an accounting to Charlan, showing that Charlan's share of the excess improvement costs beyond the AICB was $592,122. Charter Building indicated to Charlan that it would accept $325,000 in settlement of $592,122 amount. Charlan, in a May 15, 2013 email to Charter Building, agreed to "reimburse" Charter $325,000. Charter presented Charlan with an Amendment to the Agreement,

---

[6] The cost of Phase 4 improvements that Charlan was not required to complete was $605,576.24; $8.6 million less that amount is the AICB - $7,994,423.76.

memorializing this agreement, but Charlan never signed it. *See* Trial Court Opinion, *supra* at 9, 25; N.T. Bench Trial, 1/4/18, at 72-73.

In July 2013, Charlan instructed its Comptroller, Julie Landis, to shred the last seven (7) years of invoices relating to Mill Creek, thus destroying documentation of what Charlan allegedly spent on improvements in 2005 and earlier. *See* Order, 6/11/18 (amending findings of fact). In a September 4, 2013 email from Charlan to Charter Building, Charlan stated that it was obvious the parties "can't work this out. You have our last offer so do what you feel you need to." Email from Doug Desmond [of Charlan] to Rob Bowman [of Charter Building], 9/4/13, Charlan's Exhibit 29.

On February 13, 2015, Charter Building filed suit against Charlan, alleging breach of contract and related claims, and seeking to recover improvement costs pursuant to the Agreement. Charter Building filed an amended complaint on April 10, 2017, based on post-complaint discovery, that Charlan had not actually reached the AICB amount (of $7,994,423.76).

In its complaint, Charter Building alleged that after the Agreement was signed, "Charlan did not have the funds to pay for all of the Improvements and requested that [Charter Building] pay for the Improvements." Complaint, 2/13/15, at ¶ 20. Charter Building also alleged that Charlan assured it "that it would reimburse [Charter Building] for the amount it had to spend to complete the Improvements up to the $8.6 million threshold[, and o]nce the costs exceeded $8.6 million, Charlan would reimburse [Charter Building] for half the amount spent by [Charter Building] thereafter." *Id.* at ¶ 21. *See*

*also id.* at ¶ 33.  In reliance on Charlan's promise, Charter Building averred that it incurred costs in the amount of $1,246,891.00.  *Id.* at 22.

Charter Building claimed that it had agreed to use its own funds for improvements, "based on its expectation and the understanding between [the parties] that Charlan would reimburse [Charter Building] for one hundred percent of the amount it spent up to the $8.6 million specified in the Agreement, and fifty percent of the amount spent by [Charter Building] above and beyond the $8.6 million threshold specified in the Agreement."  *Id.* at ¶ 29.  Further, Charter Building averred that "Charlan failed to pay for the first $8.6 million in Improvements Costs and [Charter Building] was required to pay for some of the Improvements that were clearly Charlan's responsibility."  *Id.* at 34.

Robert P. Bowman, President of Charter Building, testified why it was Charter Building's position that Charlan had not paid the threshold $8.6 million in improvement costs:

> [W]hen we asked for information, backup, this detailed report was provided, say, I think a handful of invoices.  There is no – primarily no backup to this document.  All we really have are these headings, what we assume are costs are under those headings that were spent at Mill Creek.  But if I were just to take out the ones that are not improvement costs, the number falls dramatically from totals that are here to an amount that we believe were paid for improvement costs.  So those are two reasons I believe that they didn't hit that.  One, I don't have any verification of whether there were Mill Creek invoices or not. The second point is that the typical improvement costs which are contemplated under the [A]greement, there are a lot of costs on this list that aren't considered improvement costs.

N.T. Bench Trial, 1/4/18, at 91. Additionally, Bowman testified that he first came to the conclusion that Charlan had not paid $8.6 million in improvement costs "[a]fter we got this detailed summary," which was in response to a discovery request, after the original complaint had been filed in 2015. *Id.* at 92-93. He clarified that between 2007 and 2015, he had no reason to doubt that Charlan had paid $8.6 million in improvement costs, because George Desmond, general partner of Charlan, with whom he had had a business relationship since 1999, had told him so. *Id.* at 92 ("George told me $8.6 million and I believed him."). At trial, Charlan admitted that the Agreement stated that it was required to complete all improvements shown on the development plans.[7]

_____

[7] The Agreement provides, as follows:

**5. RESPONSIBILITIES OF SELLER AND BUYER**

Seller [Charlan] shall be responsible for completion of all improvements required in connection with the Land Use Plan, recorded Subdivision Plan or Plans, and other plans submitted to and approved by all governmental entities having jurisdiction thereof (hereinafter collectively referred to as the "Development Plans"), in accordance with all requirements of all governmental entities having jurisdiction thereof, including all grading, streets, curbs, storm water system (excluding individual Lot storm water detention facilities, if any), common facilities including (but not limited to) the neighborhood center, recreational facilities, walking path, street lighting, common area landscaping, and public water and sanitary sewer lines, underground electric, telephone and other required utilities.

Following trial, the court issued findings of fact and conclusions of law. In particular, the court found as follows:

1. Charlan spent a total of $7,052,519.88 on Improvements;

2. Charter Building incurred costs of $1,166,164.02 for Improvements;

3. The total Charlan and Charter Building spent on Improvement Costs is $8,218,683.90;

4. Charlan was solely responsible for paying the Adjusted Improvement Costs Budget of $7,994,423.76;

5. The difference between the $8,218,683.90 and the Adjusted Improvement Costs Budget of $7,994,423.76, is $224,260.14;

_____

Lot Purchase Agreement, 9/19/02, at § 5. The Agreement also provided that in the event the improvements totaled less than $8.6 million, Charlan would pay half of the difference/savings to Charter Building:

**6. COSTS OF SELLER RESPONSBILITIES AND BUYER CREDIT**

Seller's [Charlan's] direct costs for the responsibilities of Seller as forth in Section 6 of this Agreement, including the development of all phases of Mill Creek, are estimated to total Eight Million Six Hundred Thousand and no/100 Dollars ($8,600,000.00) ("Improvement Costs"). . . . Upon the completion of the responsibilities of [Charlan] as set forth in Section 5 of this Agreement, if the Improvement costs shall be less than Eight Million Six Hundred Thousand and no/100 Dollars ($8,600,000.00), [Charlan] shall pay to [Charter Building] one half of the difference between the final Improvement Costs and Eight Million six Hundred Thousand and no/100 Dollars ($8,6000,000.00).

*Id.* at ¶ 6.

6. Under section 3(a)(ii) of the Lot Purchase Agreement, Charter Building had to pay 50% of the Improvement Costs in excess of the budget to Charlan.[8]  This amounted to $112,130.07; [and]

7. Since Charter Building had paid $1,166,164.02 for Improvements in place of Charlan, when it was only supposed to have paid $112,130.07, Charlan owed Charter Building the difference, which amounted to $1,054,033.95.

Trial Court Opinion, 5/7/18, at 12, 22-23.  As noted above, the court entered judgment in favor of Charter Building for $1,054,033.95.  Charlan filed a post-trial motion on May 17, 2018 and this timely appeal followed.

_____

[8] Section 3(a)(ii) of the Agreement provides:

a. For all Lots, [Charter Building] shall pay to [Charlan] as the Purchase price for each Lot[:]

   ii.   The aggregate sum of:

   (1)   Twenty Three percent (23%) of the Base Price of each home and Lot sold by [Charter Building] as Builder to a Homebuyer; and

   (2)   Fifty percent (50%) of the Lot Premium, if any, paid by the Homebuyer; and

   (3)   Fifteen percent (15%) of the price of Options incorporated into the home sold by [Charter Building] as Builder to the Homebuyer, and

   (4)   In the event that Improvement Costs (as defined in Section 6 of this Agreement exceed the sum of $8,600,000, one two hundred thirty sevenths (1/237) of fifty percent of the difference between the total Improvement costs and $8,600,000.

Lot Purchase Agreement, *supra* at 3(a)(ii).

We address Charlan's first two claims together. Charlan argues the court erred in finding that the statute of limitations[9] was tolled and in inferring that Charlan misrepresented that it had paid $8.6 million in improvement costs. Charlan argues that Charter Building's cause of action accrued in 2006, when Charlan first told Charter Building that it had satisfied the relevant portion of the Agreement. *See* Trial Court Opinion, *supra* at 7, 10. Charlan claims that Charter Building's 2015 lawsuit, amended in 2017, is time-barred as to the contract claim, and that the trial court erred in allowing the discovery rule to toll the statute, thereby improperly increasing Charter Building's damages. Charlan relies on *Fine*, *supra*, to support its argument.

In *Fine*, the Court stated "the discovery rule applies to toll the statute of limitations in any case where a party neither knows nor reasonably should have known of his injury and its cause at the time his right to institute suit arises." *Id.* at 859. Charlan is not entitled to relief under *Fine*.

The trial court found that Charlan told Charter Building in "approximately 2006," and "[i]n late 2007," that it had spent $8.6 million improvement costs and thereafter consistently claimed it had exceeded the AICB. *See id.* at 7, 10. Charlan produced a document entitled "Job Transaction Detail Report," which listed costs Charlan purportedly incurred at Mill Creek; however, Charlan produced no invoices, bills, payments requests, checks or evidence to support its claims, contending all documentation from

---

[9] Pennsylvania's statute of limitations requires lawsuits upon a contract to commence within four years. *See* 42 Pa.C.S.A. § 5525(a).

2005 and earlier was destroyed in 2013. **See** Order, 6/11/18 (amending findings of fact). Since Charlan destroyed its evidence, and presented no evidence in support of its claims, the trial court, sitting as finder of fact, found its witnesses not credible. The court found Charter Building credibly testified that it was never provided with detailed invoices for amounts it was charged by Charlan for improvements prior to 2008. **See** N.T. Bench Trial, 1/4/18, at 91-93 (Testimony of Robert Bowman).

Significantly, the court concluded that Charter Building's cause of action against Charlan arose on September 4, 2013, when Charlan indicated it would not be paying the previously-agreed reimbursements (for improvements paid for by Charter Building during the height of the housing crisis). Further, Charlan indicated that if Charter Building would not accept reimbursement in lots, Charlan essentially invited Charter Building to file suit, "[D]o what you feel you need to." Charter Building then filed its suit on February 13, 2015, within the four-year statute of limitations.

As the court reasoned, "it is not unusual for a party to agree to pay money on another's behalf based on agreement that the debt will be repaid at an unspecified later time." Trial Court Opinion, **supra** at 23. Here, the court concluded that Charlan's "obligation to repay the debt" arose, based on the facts and circumstance here, "when the housing market rebounded." **Id.** at 23-24. In particular, it was not until after Charter Building filed suit and it obtained Charlan's Job Transaction Detail Report, that Charter Building's claim for the excess improvement costs accrued. The court determined that Charter

was previously unaware that Charlan "did not actually incur costs up to the [AICB] as Charlan told Charter Building in 2006 that it had spent $8.6 million and thereafter consistently claimed that it had exceeded the [AICB]. *Id.* at 24, citing N.T., 1/4/18, at 90-92, N.T. 1/5/18, 183-84, 237. Thus, the court concluded, Charter Buildings' claim for Charlan's share of the excess improvement costs was timely. *Id.* at 24.

We also find Charlan's argument that the court erred in "inferring an affirmative act of misrepresentation" to justify tolling the statute of limitations, misplaced. The trial court based its conclusion on the discovery rule-- that the statute was tolled because Charter Building did not know, or could not reasonably have known, of its damages until (a) Charlan indicated it would not reimburse Charter, and (b) Charter Building received Charlan's Job Transaction Detail Report after the original complaint was filed. Charlan's attempt to cast the trial court's tolling of the statute as based on a "finding" of misrepresentation, is a red herring. Fraudulent concealment is a separate ground that may toll a statute of limitations. Charlan attempts to conflate the two, arguing that a showing of fraud is required in order for the court to apply the discovery rule to toll the statute. Fraud need not be shown in order for a party to invoke the discovery rule. As we noted in *Gustine Uniontown Assocs., Ltd. v. Anthony Crane Rental, Inc.*, 892 A.2d 830 (Pa. Super. 2006):

> The discovery rule is distinct from the issue of whether a party is equitably estopped from invoking the statute of limitations. *Fine v. Checcio*, 582 Pa. 253, 870 A.2d 850 (2005). The discovery

rule operates to toll the statute of limitations during the period the plaintiff's injury or its cause was neither known nor reasonably knowable to the plaintiff. *Id.* The separate doctrine of fraudulent concealment tolls the statute based on an estoppel theory and provides that a defendant may not invoke the statute of limitations if through either intentional or unintentional fraud or concealment, the defendant causes the plaintiff to relax his vigilance or deviate from his duty of inquiry into the facts. *Id.* Thus, the former doctrine involves a plaintiff's lack of knowledge and the latter doctrine pertains to a defendant's conduct after the cause of action arose.

*Id.* at 835.n.2.

Here, the court did not make a finding of misrepresentation; it determined that the discovery rule applied. As the record supports the trial court's findings, we find no error. *See Gleason v. Borough of Moosic*, 15 A.3d 479 (Pa. 2011) (where complaining party is reasonably unaware that his or her injury has been caused by another party's conduct, discovery rule suspends, or tolls, running of statute of limitations). *See also Ruthrauff*, *supra* at 888; *John B. Conomos, Inc. v. Sun Co., Inc.*, 831 A.2d 696, 703 (Pa. Super. 2003) (our task is to "determine whether there is competent evidence in the record that a judicial mind could reasonably have determined to support the finding.").

Charlan's final claim, that the court erred in not finding Charter Building was estopped from changing its "acceptance that $8.6 million in Improvement Costs had been paid by Charlan," is waived. Charlan did not raise this claim in its May 17, 2018 motion for post-trial relief. *See Chalkey v. Roush*, 805 A.2d 491, 496 (Pa. 2002); Pa.R.C.P. 227.1.

- 14 -

We, therefore, affirm the judgment entered in favor of Charter Building, and we direct the parties to attach a copy of Judge Brown's comprehensive opinion in the event of further proceedings in this matter.  *See* Pa.R.A.P. 1925(a) Order, 8/6/18; Findings of Fact/Conclusions of Law, 5/7/18.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/26/2019

Received 7/25/2018 12:30:59 PM Superior Court Middle District
Circulated 04/01/2019 01:37 PM

Filed 7/25/2018 12:30:00 PM Superior Court Middle District
ENTERED AND FILED
PROTHONOTARY'S OFFICE 2018
LANCASTER, PA
***Electronically Filed*****
May 07 2018 07:45AM
Audrey Conrad

IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
CIVIL ACTION – LAW

CHARTER HOMES AT MILL CREEK,      :
INC.,      :
         Plaintiff,      :
     :
     :
         vs.      :     No. CI-15-01375
     :
CHARLAN GROUP, L.P.,      :
         Defendant.      :
     :
         &      :
     :
CHARTER HOMES BUILDING CO.,      :
         Additional Defendant.      :

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

AND NOW, this 4th day of May 2018, after trial of this case and the submissions of the parties suggesting their proposed findings of fact and conclusions of law, the court makes the following findings and conclusions.

### BACKGROUND

1.      Charlan Group, L.P. ("Charlan") owned undeveloped property in West Lampeter Township which it purchased for $1,309,893.60. (N.T. 230, G. Desmond; N.T. 134, Grupe).

2.      Charlan intended to develop the property into a residential neighborhood consisting of approximately 90 home sites. (N.T. 9-10, Bowman; N.T. 230, G. Desmond).

3.      Robert P. Bowman is the President of Charter Homes Building Company ("Charter Building") ("Charter" used generally throughout for entities in which Bowman has 100 percent ownership interests), which he started in 1998. (N.T. 8-9, Bowman).

4.      George Desmond is the general partner of Charlan and his two sons, Doug Desmond and Greg Desmond, are limited partners in Charlan. (N.T. 9, Bowman; N.T. 230, G. Desmond).

## CHARLAN AND CHARTER DECIDE TO DEVELOP MILL CREEK INTO A UNIQUE RESIDENTIAL DEVELOPMENT

5.     Charlan and Charter had a business relationship from having worked on a nearby neighborhood called "Hunter's Ridge," where an entity owned by George Desmond was the subdivision developer and lots were sold to Charter, who built homes on the lots. (N.T. 8-9, Bowman). This lawsuit has arisen due to the breakup of the business relationships the parties had established over the years.

6.     In early 2000, Charlan talked to Charter Building about purchasing lots and building homes at a nearby property that Charlan owned. This would later become known as the Mill Creek Community ("Mill Creek"). (N.T. 8-9, Bowman; N.T. 230, G. Desmond).

7.     Charlan and Charter approached West Lampeter Township about developing the site so that it would be comprised of 237 lots or home sites. (N.T. 10, Bowman; N.T. 231, G. Desmond).

8.     The plan that Charlan and Charter Building prepared required Charlan to make improvements that were needed for the residential neighborhood ("Improvements"). Lots would then be sold to Charter Building, who would build homes on the lots for sale to consumers. (N.T. 17-19, Bowman; N.T. 234, G. Desmond).

9.     Charlan and Charter estimated that the cost of the Improvements ("Improvement Costs") would be $8.6 million. (N.T. 19, Bowman; N.T. 234, G. Desmond).

10.     Charter and Charlan (specifically Robert Bowman and George Desmond) had land development plans prepared showing all the work that West Lampeter Township required, such as grading, streets, water, sewer, curbs, lights, and similar items ("Development Plans"). (N.T. 234-236, G. Desmond; N.T. 12-13, Bowman; Exs. P-22-28).

2

11. Six (6) phases were contemplated at Mill Creek, but two (2) were eventually combined so there were a total of five (5) phases. (N.T. 15, Bowman; N.T. 231, G. Desmond).

12. The Development Plans showed Improvements that Charlan would be required to make. (N.T. 18-19, Bowman; Exs. P-22-28).

### CHARLAN AND CHARTER ENTER INTO A LOT PURCHASE AGREEMENT CONCERNING THE MILL CREEK DEVELOPMENT AND THE SALE OF LOTS

13. Charter and Charlan also entered into a contract titled "Lot Purchase Agreement," which outlined their respective duties and obligations for the development of Mill Creek. (Ex. P-1; Ex. D-1; N.T. 20, Bowman; N.T. 232, G. Desmond).

14. The Lot Purchase Agreement was signed by Robert Bowman on behalf of Charter Building and George Desmond on behalf of Charlan. (Ex. P-1; Ex. D-1).

15. The Lot Purchase Agreement contemplated that there would be 237 lots that Charlan would sell to Charter Building. (Ex. P-1; Ex. D-1).

16. The Lot Purchase Agreement permitted Charter Building to assign its interest in the Agreement, without Charlan's authorization, to any entity owned 100 percent by Robert P. Bowman, and provided as follows in that regard:

> Except as specified herein, this Agreement may not be assigned or transferred by Buyer or Seller without the prior written consent, which consent shall not be unreasonably withheld, of the other party to this Agreement. No assignment shall relieve or discharge the assignor of its obligations pursuant to this Agreement. As to permitted assignments, this Agreement shall benefit and bind Seller and Buyer and their respective successors and assigns. **Any assignment to a business entity of which Robert P. Bowman is a principal holding an ownership interest of not less than one hundred percent (100%) shall be deemed a permitted assignment.**

(Ex. P-1; Ex. D-1, Section 9, Assignment) (emphasis added).

17. On October 10, 2002, Charter Building entered into a written assignment of the Lot Purchase Agreement in which it assigned all of its rights and interest in the Lot Purchase

3

Agreement with Charlan to Charter Homes at Mill Creek, Inc. ("Charter Mill Creek"). Robert P. Bowman owns 100 percent of both Charter Building and Charter Mill Creek, and assigned the Lot Purchase Agreement for financing and accounting reasons. (Ex. P-2; N.T. 21, Bowman).

18. The Lot Purchase Agreement required Charlan to complete all Improvements required by the Development Plans, specifically providing as follows:

**5. RESPONSIBILITIES OF SELLER AND BUYER**

Seller shall be responsible for completion of all improvements required in connection with the Land Use Plan, recorded Subdivision Plan or Plans, and other plans submitted to and approved by all governmental entities having jurisdiction thereof (herein after collectively referred to as the "Development Plans"), in accordance with all requirements of all governmental entities having jurisdiction thereof, including all grading, streets, curbs, storm water system (excluding individual Lot storm water detention facilities, if any), common facilities including (but not limited to) the neighborhood center, recreational facilities, walking path, street lighting, common area landscaping, and public water and sanitary sewer lines, underground electric, telephone and other required utilities.

(Ex. P-1; Ex. D-1, Section 5; N.T. 19, Bowman).

19. Charlan contends that it was not required to complete all the Improvements. Rather, Charlan's principal George Desmond testified that he believed Charlan was only required to complete Improvements up to a maximum cost of $8.6 million, and that Charter would be responsible for completing (and paying for) Improvements after that point. (N.T. 234, 239, G. Desmond).

20. During trial, Charlan's George Desmond admitted that the Lot Purchase Agreement at Section 5, Responsibilities of Seller and Buyer, discussed above, provides that Charlan is required to complete all Improvements shown on the Development Plans and Desmond admitted that there is no limitation on the amount Charlan was required to spend in order to do so. (N.T. 246-247, G. Desmond).

4

21.     The Improvements contemplated by the Lot Purchase Agreement are, by the express language of Section 5, those that are shown on Exs. P-22 through P-28 which are the Development Plans. (Exs. P-22-28; N.T. 234-236, G. Desmond). The parties' course of dealing after the housing crisis hit in 2008, however, indicates that other costs were acquiesced to in the scope of "improvements."

22.     The Lot Purchase Agreement also provides that, in the event the Improvement Costs total less than $8.6 million, Charlan must pay half of the savings to Charter. (Exs. P-1; D-1, Section 6).

23.     The Lot Purchase Agreement also addresses the prices at which Charter would purchase lots from Charlan. It provides that Charter would pay to Charlan the greater of fixed prices (which increased on an annual basis), or prices comprised of 23 percent of the base price of each home and lot, 50 percent of the lot premiums paid by the homebuyers, and 15 percent of the options purchased by the homebuyers. This is known as the aggregate sum method of price calculation. (Ex. P-1; Ex. D-1; N.T. 232, G. Desmond).

24.     Pursuant to the Lot Purchase Agreement, if the aggregate sum pricing method was used, and in the event that the Improvement Costs exceeded $8.6 million, Charter was to pay an additional amount for the purchase of each lot. Specifically, Charter was to pay one two-hundred-thirty-seventh (1/237) of 50 percent of the difference between the total Improvement Costs and $8.6 million. (Ex. P-1; Ex. D-1, Section 3(a)(ii)(4)).

25.     In other words, Charter was required to reimburse Charlan for 50 percent of the excess Improvement Costs.

5

26. If the fixed price method of lot pricing was used pursuant to Section 3(a)(i) of the Lot Purchase Agreement, Charter would have no obligation to reimburse Charlan for any portion of the cost overruns incurred by Charlan to complete the Improvements.

27. Although the fixed price method does not require Charter to pay any excess Improvement Costs and the aggregate sum method requires Charter to pay half the excess Improvement Costs, Charlan's George Desmond testified that Charter was responsible for 100 percent of the excess costs regardless of which method was used. (N.T. 255-256, G. Desmond).

28. Though the parties reduced their agreement to writing regarding the purchasing of lots and the development of the property, their course of dealing over the following years was inconsistent with some provisions of their written agreement.

29. The Lot Purchase Agreement contemplated that all of the Improvements would be completed prior to Charter purchasing lots from Charlan, but that did not occur due to significant interest in the development by home buyers, and Improvements were constructed concurrent with the purchase of lots by Charter.

30. Mill Creek proved to be very attractive to the public, and Charter purchased 21 lots from Charlan soon after the Lot Purchase Agreement was signed. (N.T. 26, Bowman).

31. By the end of 2006, and into early 2007, Charter had purchased approximately 150-175 lots from Charlan as Mill Creek was proving to be popular, with sales prices increasing during that time frame. (N.T. 26-27, Bowman).

32. Improvements were being constructed by Charlan while all these lot sales were occurring.

6

33. Although Mill Creek was originally comprised of five phases, Phase 4 was eliminated (because Charlan sold the land to Charter for $670,000) and Charlan was relieved of its obligation to complete the Improvements associated with Phase 4. (N.T. 125, Grupe).

34. The cost or value of the Phase 4 Improvements that Charlan was not required to complete was $605,576.24. (N.T. 126, Grupe).

35. When this amount is deducted from the $8.6 million budget to complete the Improvements, the resulting figure is $7,994,423.76 (the "Adjusted Improvement Costs Budget"). (N.T. 126, Grupe; Ex. P-5).

36. In late 2007, Charlan informed Charter that it had spent $8.6 million on Improvement Costs. (N.T. 32, Bowman).

37. 2008 also marked the beginning of the housing crisis, at which point sales of lots and homes in Mill Creek essentially ground to a halt. (N.T. 28, Bowman).

38. Charlan had a mortgage on the remaining undeveloped property issued by Sovereign Bank, and George Desmond was concerned that the housing crisis and the lack of sales at Mill Creek might result in a foreclosure on the property by the bank. (N.T. 244-245, G. Desmond; N.T. 29-30, Bowman). Desmond was also concerned about having to pay taxes, HOA fees, and costs for upkeep. (N.T. 244-245, G. Desmond).

39. George Desmond told Rob Bowman at that time that Charlan was no longer in a position to continue paying for Improvements as required by the Lot Purchase Agreement. Charter agreed to pay for Improvements and to reimburse Charlan for any costs Charlan incurred with the understanding that once the economy improved and lot sales picked up, Charlan would pay Charter back or reimburse Charter for half the Improvement Costs in excess of the Adjusted Improvement Costs Budget. (N.T. 30, Bowman).

7

40. Between 2008 and 2010, there were very few lot sales due to the housing crisis, with zero lots sold in 2009 and only two in 2010. (N.T. 37-38, Bowman; Ex. D-18).

41. There were no lot sales at all for almost two years between May 7, 2008, and March 5, 2010. (Ex. D-18). This was the height of the housing crisis.

42. Charlan sent statements to Charter and Charter reimbursed Charlan during this time in accordance with the modification for Charter to pay the Improvement Costs until the economy recovered. (Exs. D-9-17; N.T. 33-35, Bowman).

43. Charter paid the statements sent to it by Charlan, which included financing costs, legal fees, engineering fees, and township fees. (Exs. D-9-17). No evidence was presented that Charter contested these financing costs, legal fees, engineering fees, and township fees by asserting that Charter was not responsible as the costs were not defined as "improvements" under the Lot Purchase Agreement.

44. Charter also paid for Improvement Costs directly during this 2008-2010 time frame. (Ex. P-4; Ex. P-6; N.T. 122-123, Grupe).

45. In 2012, lot sales finally began to pick up at Mill Creek as the economy improved, and Rob Bowman requested that Charlan pay its share of the cost overrun and Improvement Costs advanced by Charter. (N.T. 41-43, Bowman).

46. By 2012, Doug Desmond had become very active in Charlan. (N.T. 42, Bowman; N.T. 270-271, D. Desmond).

47. Rob Bowman provided an accounting to Charlan's Doug Desmond showing that as of October 31, 2012, Charlan's share of the excess Improvement Costs beyond the Adjusted Improvement Costs Budget was $592,122, and indicated that Charter would accept $325,000 from Charlan. (Ex. D-25; N.T. 43-44, Bowman; Ex. D-26).

8

48. On May 15, 2013, Charlan agreed in writing to "reimburse" Charter $325,000 for expenses incurred by Charter Mill Creek up to that point. (Ex. D-27). Charlan also indicated that in the future, all invoices for Improvement Costs would be pre-approved by both Charlan and Charter and "split 50/50." (Ex. D-27; N.T. 47-48, Bowman).

49. Specifically, that email provided as follows:

Rob, spoke with Pop and we agreed to wrap this up based on our last conversation:
Reimburse Charter for $325,000 worth of value to settle carried expenses up to date of settlement.
From date of settlement forward, invoices for included phases will be pre-approved by both parties, split 50/50 and paid monthly.
Additional lot premiums will be split 50/50 and paid at settlement.
These are the current lot prices good though April 2014.
Please respond with the premiums you will be adding for each lot and I will work with you to settle this out ASAP.

Thanks,
Doug

(Ex. D-27).

50. Charter presented Charlan with an Amendment to Lot Purchase Agreement to memorialize the agreement for Charlan to reimburse Charter, but Charlan never signed it. (Ex. D-28; N.T. 73, Bowman).

51. On September 4, 2013, Charlan's Doug Desmond emailed Robert Bowman, essentially advising that if Charter was unwilling to accept payment in lots, Charter must "do what you feel you need to." (Ex. D-29).

52. In July 2013, Julie Landis, the Comptroller for George Desmond, was instructed to shred the last seven (7) years of invoices relating to Mill Creek. (N.T. 177, 180-182, Landis). That meant that all invoices that would show what Charlan allegedly spent on Improvement Costs since 2005 were destroyed. (N.T. 199-200, Landis).

9

53. Julie Landis began working for the Desmonds in 2002, and 2013 was the first time they had shredded documents. (N.T. 199-200, Landis).

54. On January 30, 2015, Charter filed suit against Charlan, seeking damages representing Charlan's share of the excess Improvement Costs.

55. George Desmond of Charlan acknowledged that where lot purchases are based on the aggregate sum calculation, Charlan and Charter are required to equally split excess Improvement Costs beyond the Adjusted Improvement Costs Budget. (N.T. 249-250, G. Desmond).

56. Charlan never sold lots to Charter using the base price method. Rather, only the aggregate sum method was used until 2008. (Ex. D-18). After that, George Desmond set lot prices based on what he thought was reasonable based on market conditions. (N.T. 261-262, G. Desmond).

57. When the housing crisis occurred in 2008 and lot sales came to a halt, Charter and Charlan set lot prices based upon amounts that Charlan determined would be sufficient to generate lot sales. (N.T. 261-262, G. Desmond).

58. George Desmond provided lists of lots and the corresponding prices to Charter. (N.T. 262, G. Desmond). There is no evidence that the parties used the base price method of calculating lot prices.

59. Charlan told Charter in 2006 that it had spent $8.6 million and thereafter consistently claimed that it had exceeded the Adjusted Improvement Costs Budget. (N.T. 90-92, Bowman; Exs. D-9-17; N.T. 183-184, Landis; N.T. 237, G. Desmond).

60. After filing suit in February 2015, Charlan produced a document entitled "Job Transaction Detail Report" listing all the costs that Charlan purportedly incurred at Mill Creek.

10

b. Interest costs of $409,683.83

c. Settlement costs of $22,362.10

67. The Job Transaction Detail Report also lists significant attorneys' fees but no testimony or evidence of any invoices were submitted to allow the court to decode the invoices referenced.

68. The total Charlan spent on Improvements is therefore $7,052,519.88.

69. In addition, Charter incurred Improvement Costs totaling $1,166,164.02. (Ex. P-32; N.T. 141-142, Grupe).

70. The total Charlan and Charter spent on Improvement Costs is thus $8,218,683.90.

71. The Adjusted Improvement Costs Budget is $7,994,423.76. The difference between the $8,218,683.90 Charlan and Charter spent on Improvement Costs and the Adjusted Improvement Costs Budget of $7,994,423.76 is $224,260.14. Assigning 50 percent to both Charlan and Charter is $112,130.07 each.

72. Prior to receiving and having the opportunity to examine the Job Transaction Detail Report, Charter had no reason to know or suspect that Charlan was not telling the truth when representing to Charter that the Improvement Costs actually exceeded the budget. (N.T. 91-92, Bowman) (testifying that until the Job Transaction Detail Report was produced, he believed and had no reason to doubt George Desmond's statements that Charlan had spent $8.6 million).

### CHARLAN'S DAMAGE CLAIMS

73. Charlan seeks three categories of damages. The first is "Job Cost Reimbursement owed for Mill Creek development from January 2013 (four years prior to filing counterclaim) through November 30, 2017: $141,103.22." (Ex. P-33).

74.     Charlan did not introduce a single invoice, bill, payment request, or check representing any job costs incurred. Rather, Charlan introduced only Exhibit P-11 entitled "Job Costs Post 4-28-2011" in support of this claim. However, neither Julie Landis nor anyone else from Charlan was able to identify which entries in Exhibit D-21 constitute the $141,139.22 Charlan is seeking in this case.

> Q:    Have you yourself ever added up the January '13 and later entries
>        to calculate the figure of $141,139.22 or not?
> A:    I'm not sure where that figure comes from.
>        I don't have documents here.
> Q:    Understood, but do you have a recollection of ever having
>        calculated that figure yourself using these documents?
> A:    No.

(N.T. 215:18-24, Landis).

75.     The second category of damages being sought by Charlan is entitled "HOA Fees Paid by Charlan from January 2013 (four years prior to filing counterclaim) through November 30, 2017: $51,244." (Ex. P-33).

76.     Charlan did not introduce a single invoice, bill, payment request for HOA fees or check representing payment of any HOA Fees.

77.     In support of this claim, Charlan introduced only Exhibit D-22 entitled "Mill Creek HOA Fees Paid By Charlan Post 4-28-2011." (Ex. D-22; N.T. 210-211, Landis).

78.     However, neither Julie Landis nor anyone else from Charlan could identify which entries in Exhibit D-22 are included in the $51,244 being sought by Charlan. (N.T. 210-211, Landis).

> Q:    Which ones constitute the 51,244 then?
>        Which are not included, whichever is easier.
> A:    I'm not sure where that figure came from.

(N.T. 211:13-15, Landis).

13

79. Third, Charlan asserts damages of $1,172,000 as a result of nine building lots that Charter did not purchase.

80. Charlan contends that Charter breached the Lot Purchase Agreement by announcing in 2016 that it would not purchase the remaining lots in Mill Creek. (Ex. P-33).

81. At trial, however, Charlan did not introduce any evidence regarding the unpurchased lots or the price of those lots.

82. Also, Charter introduced a letter dated October 29, 2015, from Charlan's counsel at the time, Brandon Harter, Esq. of Hartman Underhill & Brubaker, advising Charter that it was relieved of the obligation to purchase any more lots at Mill Creek. (Ex. P-30; N.T. 105-106, Bowman). That letter stated in pertinent part as follows:

> My client hereby accepts that Charter Homes' proposal to immediately terminate the lot purchase agreement dated September 19, 2002. As a result of this termination, effective immediately, Charter Homes is relieved of any further obligations to purchase and my client is relieved of any further obligations to sell any remaining lots in Mill Creek Development.

(Ex. P-30).

83. Charlan also testified that it sold some of the lots to another builder, but no evidence was introduced about the sales prices or any other aspect of the transactions. (N.T. 241, G. Desmond).

## CONCLUSIONS OF LAW

1. The Lot Purchase Agreement is a valid and binding contract.

2. Contract interpretation is a matter for this court to decide and where a contract is not ambiguous, a court must enforce it as written no matter how unjust one party feels it is.

3. Also, failure to read or understand a contract is not a defense to its enforcement. Wilson Area Sch. Dist. v. Skepton, 895 A.2d 1250 (Pa. 2006); Mormellow v. Mormellow, 682

14

A.2d 824, 826 (Pa. Super. 1996) (a party is bound by what it signs regardless of whether it believes it is a good bargain).

4.    It is well settled under Pennsylvania law that, in interpreting a contract, the manifest intentions and purposes of the parties are of the utmost importance. Frickert v. Deiter Bros. Fuel Co., 347 A.2d 701 (Pa. 1975).

5.    The intention of the parties must be ascertained from the agreement itself, and the court's inquiry should focus on what the agreement itself expressed and not on what the parties may have silently intended. Empire Sanitary Landfill, Inc. v. Riverside Sch. Dist., 739 A.2d 651, 654 (Pa. Cmwlth. 1999) (citing Del. Co. v. Del. Co. Prison Employees Indep. Union, 713 A.2d 1135 (Pa. 1998)).

6.    The law requires a court to ascribe a reasonable interpretation to an agreement. A court must interpret an agreement in a way that is consistent with, and gives effect to, the agreement as a whole. Mowry v. McWherter, 74 A.2d 154, 158 (Pa. 1950) (holding that it is "necessary to consider all of [a contract's] parts in order to determine the meaning of any particular part as well as of the whole"); Gaffer Ins. Co. v. Discover Reinsurance Co., 936 A.2d 1109, 1113 (Pa. Super. 2009) (holding that a "contract must be interpreted as a whole, and an interpretation that gives effect to all of the contract's provisions is preferred"); Meeting House Lane. Ltd. v. Melso, 628 A.2d 854, 857-58 (Pa. Super. 1993) (holding that "[o]ne part of a contract cannot be interpreted so as to annul another part, and a contract must be construed, if possible, to give effect to all of its terms").

7.    A fully integrated contract that requires all subsequent amendments be made in a writing executed by all parties, however, may be amended orally upon a showing of clear and convincing evidence. Brinich v. Jencka, 757 A.2d 388, 399 (Pa. Super. 2000) (holding that a

15

written contract may be modified orally, even when the written contract provides that modifications may only be made in writing, provided that the subsequent oral modification is "proved by clear, precise and convincing evidence"), appeal denied, 771 A.2d 1276 (Pa. 2001); accord Universal Builders, Inc. v. Moon Motor Lodge, Inc., 244 A.2d 10 (Pa. 1968).[1]

8.　"In cases involving contracts wholly or partially composed of oral communications, the precise content of which are not of record, courts must look to the surrounding circumstances and course of dealing between the parties in order to ascertain their intent." Prieto Corp. v. Gambone Constr. Co., 100 A.3d 602, 609 (Pa. Super. 2014) (citations and internal quotation marks omitted).

9.　Surplusage is unnecessary or excessive wording, and Pennsylvania courts will not treat words as mere surplusage. Courts have consistently held that "our rules of construction do not permit words in a contract to be treated as surplusage . . . if any reasonable meaning consistent with the other parts can be given to it." Tenos v. State Farm Ins. Co., 716 A.2d 626, 631 (Pa. Super. 1998); accord Clarke v. MMG Ins. Co., 100 A.3d 271 (Pa. Super. 2014); Gralka v. Isaacson, 556 A.2d 888, 889 (Pa. Super. 1989).

10.　Additionally, it is a fundamental principle of contract interpretation that where a contract lists certain items, and states that it includes but is not limited to these items, other items can fall within the scope of the section or provision, provided they are of a type the same or

---

[1] Both Charter and Charlan agree the parties orally modified the Lot Purchase Agreement. The results are the same in this case regardless of whether the court characterizes the parties' actions as (1) oral modifications; or (2) waivers of their rights, followed by retractions of those waivers. See Daniels v. Phila. Fair Hous. Comm'n, 513 A.2d 501, 502 (Pa. Cmwlth. 1986) ("With respect to the question of whether the landlord waived her right to enforce the lease provision concerning payment of utility bills, we note that, under the general principles of contract law, a party who has made a waiver affecting an executory portion of a contract may retract the waiver by notifying the other party that strict performance will be required of any term waived, unless such a retraction would be unjust because of a material change of position made in reliance on the waiver.").

similar to the specifically included items. Dep't of Envtl. Prot. v. Cumberland Coal Res., L.P., 102 A.3d 967, 972 (Pa. 2014).

11.    Under the Lot Purchase Agreement, Charlan was responsible to perform all of the Improvements in connection with Mill Creek.

12.    The Improvements that Charlan was required to make are identified in the Agreement as the following items:

- grading
- streets
- curbs
- storm water system
- neighborhood center
- recreational facilities
- walking path

- street lighting
- common area landscaping
- public water
- sanitary sewer lines
- underground electric
- telephone
- other required utilities

13.    While the items enumerated in Section 5 of the Lot Purchase Agreement are not the only items that constituted Improvements, only work that is similar to the enumerated items are included. Cumberland Coal, 102 A.3d at 972 (stating the word "including" followed by a list does not mean the term is limited to items enumerated in the list, but items not listed must be similar in nature to those listed).

14.    Under the Lot Purchase Agreement, it was estimated that the Improvement Costs would be $8.6 million.

15.    However, the Improvement Costs included Phase 4, which was removed from the development, and Charlan was relieved of the obligation to complete the Improvements for that phase.

16.    The parties agreed that the $8.6 million budget had to be reduced to the Adjusted Improvement Costs Budget of $7,994,423.76.

17

17.     Charlan was therefore solely responsible for paying the Adjusted Improvement Costs Budget of $7,994,423.76.

18.     After analyzing Charlan's Job Transaction Detail Report, and considering the Lot Purchase Agreement and the parties' course of dealing, the court concludes Charlan spent $7,052,519.88 on Improvement Costs.

19.     Charlan's Job Transaction Detail Report aggregates total costs by phase as follows:

        a.  Phase 1:        $7,194,037.00

        b.  Phase 2:        $2,605,221.94

        c.  Phase 3:        $156,029.69

        d.  "Overages":        $541,732.17

20.     While Charlan's Job Transaction Detail Report purports to indicate that Charlan spent more than the Adjusted Improvement Costs Budget of $7,994,423.76, not every cost constitutes an Improvement Cost under the Lot Purchase Agreement.

21.     For example, Charlan incorrectly asserts that loan interest, letter of credit fees and interest, costs to purchase the land, legal fees, and fees to prepare the plans depicting the Improvements are Improvement Costs.

22.     The court's interpretation is consistent with the West Lampeter Subdivision and Land Development Ordinance and the definition of Improvements contained in Section 240-7, which defines subdivision improvements as follows:

> Physical changes to the land, including, but not limited to, grading, paving, curbs, gutters, storm sewers, draining improvements to existing water courses, sidewalks, street signs, monuments, water supply facilities, and sewage disposal facilities that may be necessary to produce usable and desirable development.

(Ex. P-31, Section 240-7).

23.     Improvement Costs under the Lot Purchase Agreement equate to the costs of physical improvements to the land and the course of dealing of the parties that also included traffic study related costs, interest costs, and settlement costs.

24.     George Desmond of Charlan incorrectly believed that Improvement Costs were "everything that we needed to put together in order to get to final subdivision and to get in and start doing the mechanical work." (N.T. 234, G. Desmond). Mr. Desmond also incorrectly believed that Improvement Costs included "anything having to do with Mill Creek." (N.T. 257-258, G. Desmond).

25.     Mr. Desmond admitted, however, that the Lot Purchase Agreement does not state that Improvement Costs consist of "anything having to do with Mill Creek" and he stated that he does not know why that is:

> Q:     Do you believe that anything that you spent, any money that you spent that had anything to do with the Mill Creek Development qualified as an improvement cost as for purposes of the seller's obligation?
> A:     Basically, yes. We looked at it that way.
> Q:     Does the agreement also say that anything having to do with Mill Creek Development constitutes an improvement cost?
> A:     Basically does, yes, through direct costs, indirect costs and --
> Q:     Please turn to the deposition transcript, if you still have it in front of you. Go to Page 86.
> A:     Yes.
> Q:     I ask you to look at Line 2.
>        The question I put to you: Why doesn't the agreement simply say that seller shall complete all improvements that have anything to do with the development?
>        The answer was, well I don't know why it doesn't say that.
>        That is the answer you gave at this deposition in November 2016.
> A:     Apparently so, yes.

(N.T. 257:14 – 258:11, G. Desmond).

19

26. While the items listed in Section 5 of the Lot Purchase Agreement are not the only items constituting Improvements, it must be a physical improvement to the land to constitute an Improvement.

27. The Lot Purchase Agreement provides that if the Improvement Costs exceed the budget, and if the lot prices are based on the aggregate sum calculation, Charter is responsible to pay 50 percent of the Improvement Costs in excess of the budget. (Ex. P-1, Section 3(a)(ii)).

28. According to the Lot Purchase Agreement, Charter was to pay its 50 percent share of the Improvement Costs overrun in 237 increments as it purchased lots from Charlan. This amount was to be added to the other three components of the purchase price: the base price, the lot premium and the options. Id.

29. The parties modified the Agreement relating to the mechanics by which they shared the excess Improvement Costs. They did so because Mill Creek proved to be popular and Charlan sold lots to Charter before Charlan completed the Improvements.

30. The Lot Purchase Agreement contemplated that Charlan would complete the Improvements and that the Improvement Costs would be known before Charlan sold any lots to Charter. Thus, any excess costs would be known before any lots were sold so that Charter's 50 percent share could be divided into 237 increments and paid as part of lot purchases.

31. Because that proved to be infeasible since Improvements were being made concurrently with lot sales, Charter and Charlan modified the Lot Purchase Agreement such that Charter's share of the additional costs for Improvements would not be paid as part of lot purchases.

32. The Lot Purchase Agreement clearly contemplates a sharing of savings and a sharing of any excess Improvement Costs.

20

33.     Whether Charlan may have believed that Charter was responsible for all excess Improvement Costs is irrelevant. Empire Sanitary Landfill, 739 A.2d at 654 (parties' subjective beliefs about contract are irrelevant). The relevant inquiry is the language of the agreement.

34.     Charter and Charlan agreed that Charter would begin paying Improvement Costs directly and Charlan would reimburse Charter Mill Creek when the economy improved. This was due to the downturn in the housing market and the fact that very few lot sales were occurring beginning in late 2007 as a result of economic conditions.

35.     In 2007, Charter began paying Improvement Costs and ultimately spent $1,166,164.02 and did so with the expectation that Charlan would pay its share of the Improvement Costs overrun when economic conditions improved and lot sales picked up.

36.     It is not unusual for parties to a contract to deviate from the strict adherence to the mechanics of the agreement, or to modify an agreement insofar as timing and logistics are concerned, and such modifications are enforceable. Universal Builders, 244 A.2d at 10; Brinich, 757 A.2d at 388.

37.     In this case, the parties modified the agreement as a result of the fact that lot sales occurred before completion of all Improvements, a housing downturn in late 2007-2011 resulted in Charter paying Improvement Costs during the downturn to be repaid for Charlan's share later, and to include additional costs in the understanding of Improvements.

38.     While the Lot Purchase Agreement provides that modifications must be in writing, the law is clear that the requirement for written modifications can be waived. Universal Builders, 244 A.2d at 10; Brinich, 757 A.2d at 388.[2]

---

[2] See Daniels, 513 A.2d at 502-03 ("In the case at bar, the record shows that, for a period of time, the landlord voluntarily assumed responsibility for paying the utility bills of the leased premises, and therefore waived the lease provision requiring Appellant to pay such bills. However, when the landlord informed Appellant that, as of January 1, 1983, Appellant would be required to pay her own utility bills, the prior waiver of the lease term was effectively

21

39.     Charlan admits that the Lot Purchase Agreement was orally modified and is judicially estopped from arguing that it was not capable of oral modification. (Ex. D-33).

40.     A court must construe an agreement as a whole and here, it is clear that the Agreement contemplates a sharing of any savings and a splitting of costs in excess of the Improvement Costs budget. Mowry, 74 A.2d at 158 (holding that it is "necessary to consider all of [a contract's] parts in order to determine the meaning of any particular part as well as of the whole"); Gaffer, 936 A.2d at 1113 (holding that a "contract must be interpreted as a whole, and an interpretation that gives effect to all of the contract's provisions is preferred"); Melso, 628 A.2d at 857-58 (holding that "[o]ne part of a contract cannot be interpreted so as to annul another part, and a contract must be construed, if possible, to give effect to all of its terms").

41.     The Lot Purchase Agreement required the parties to equally share any savings and to split excess Improvement Costs. The fact that they decided to modify the mechanics or details of the way in which the costs were shared does not extinguish the cost sharing requirement.

42.     The court concludes the total Charlan spent on Improvements is $7,052,519.88.

43.     Charter incurred costs of $1,166,164.02 for Improvements.

44.     The total Charlan and Charter spent on Improvement Costs is thus $8,218,683.90.

45.     The Adjusted Improvement Costs Budget is $7,994,423.76.

46.     Charlan was solely responsible for paying the Adjusted Improvement Costs Budget of $7,994,423.76.

retracted and Appellant was responsible for the utility expenses. In light of the fact that Appellant initially agreed to assume such expenses when she entered into the lease, it is not now unjust to impose upon her the duty to pay her utility bills, especially when there is no indication that she has in any way changed her position in reliance on the belief that the landlord would continue to assume responsibility for those bills.").

84.     The difference between the $8,218,683.90 Charlan and Charter spent on Improvement Costs and the Adjusted Improvement Costs Budget of $7,994,423.76 is $224,260.14.

85.     Under Section 3(a)(ii) of the Lot Purchase Agreement, Charter had to pay 50 percent of the Improvement Costs in excess of the budget to Charlan. This amount is $112,130.07.

86.     Because Charter paid $1,166,164.02 for Improvements in place of Charlan, when it was only supposed to have paid $112,130.07, Charlan owes Charter the difference of $1,054,033.95.

47.     Charter's cause of action against Charlan seeking to recover reimbursement from Charlan of Charlan's share of the excess Improvement Costs arose on September 4, 2013, when Charlan indicated it would not be paying the previously agreed reimbursement and that if Charter would not accept reimbursement in lots, Charlan essentially invited Charter to file suit, which Charter did on February 13, 2015.

48.     The statute of limitations for actions on a contract is four years. 42 Pa. C.S.A. §5525(a). A cause of action accrues when a party knows or should reasonably know that the other party breached the contract. Packer Soc'y Hill Travel Agency, Inc. v. Presbyterian Univ. of Pa. Med. Ctr., 635 A.2d 649, 652 (Pa. Super. 1993); Thorp v. Schoenbrun, 195 A.2d 870, 872 (Pa. Super. 1968) (breach of contact cause of action accrues at time of breach).

49.     It is not unusual for a party to agree to pay money on another's behalf based on agreement that the debt will be repaid at an unspecified later time. In that situation, the obligation to repay the debt arises after the passage of a reasonable time based on the facts and

23

circumstances of the situation. Wilker v. Jenkins, 88 Pa. Super. 177 (1926). Here, the parties agreed that Charlan would reimburse Charter for its share when the housing market rebounded.

50. Charter's claim for Charlan's share of the excess Improvement Costs did not accrue until after the lawsuit was filed and Charter obtained Charlan's Job Transaction Detail Report. Previously, Charter was not aware that Charlan did not actually incur costs up to the Adjusted Improvement Costs Budget as Charlan told Charter in 2006 that it had spent $8.6 million and thereafter consistently claimed that it had exceeded the Adjusted Improvement Costs Budget. (N.T. 90-92, Bowman; Exs. D-9-17; N.T. 183-184, Landis; N.T. 237, G. Desmond).

51. Under Pennsylvania law, Charter had four years from the date of the discovery of Charlan's breach of the contract to institute legal action. Pontiere v. Dinert, 627 A.2d 1204 (Pa. Super. 1993); Med-Mar, Inc. v. Dilworth, 257 A.2d 910 (Pa. Super. 1969).

52. Charter's claim for Charlan's share of the excess Improvement Costs is timely.

53. Charlan is not entitled to recover damages for "Unpurchased Lots" for several reasons. First, it did not introduce any evidence to support the damages, such as lot prices. Second, Charlan released Charter from the obligation to purchase any more lots in Mill Creek by virtue of its October 29, 2015, letter to Charter, expressly indicating that Charter is relieved of any further obligations to purchase any lots in Mill Creek and Charlan is relieved of the obligation to sell lots to Charter.

54. Charlan seeks $141,103.22 for "Job Cost Reimbursements Owed for Mill Creek Development from January 2013 through November 30, 2017." However, Charlan failed to introduce any documentation to substantiate these costs, such as invoices, bills, requests for payment, or checks.

24

55. Charlan produced only a list of Improvement Costs that Charlan claims it has been incurring, but Charlan could not identify which entries on the list are the job costs for which it seeks damages in this action. (Ex. D-21).

56. Charlan also seeks damages of $51,244 for "HOA Fees Paid by Charlan from January 2013 through November 30, 2017."

57. Once again, however, Charlan produced no documentation to substantiate the HOA fees such as invoices, bills or requests for payment of HOA fees, or checks showing payment of such fees.

58. In addition, Charlan produced an exhibit entitled "Mill Creek HOA fees paid by Charlan post 4-28-2011." However, Charlan was unable to identify which entries on this chart comprise the $51,244 that Charlan seeks in this action.

59. The court finds that Charlan has not proven its damages for HOA fees or job cost reimbursements with reasonable certainty, and such claims are denied.

60. On May 15, 2013, Charlan acknowledged its obligation to reimburse Charter for Improvement Costs that Charter incurred as a result of the Charter-Charlan modification to the Lot Purchase Agreement.

61. In September 2013, Charlan offered to reimburse Charter for costs incurred by reimbursing Charter in building lots, and stated that if that offer was unacceptable to Charter, Charter would do what it had to do.

62. Charter filed suit in 2015, approximately two (2) years following Charlan's September 2013 email declining to pay Charter $325,000 in cash.

63. Charlan's breach of the Lot Purchase Agreement occurred when it advised Charter in September 2013 that it was not willing to pay Charter in cash and telling Charter "to

do what it needed to do," and Charter's breach of contract suit filed approximately two (2) years later was timely.

64. Charter did not become aware that Charlan did not actually incur Improvement Costs up to the threshold until after it filed suit in 2015 and obtained documents from Charlan.

65. The court therefore finds that Charter Mill Creek is entitled to judgment in its favor and against Charlan in the amount of $1,054,033.95.

BY THE COURT:

LEONARD G. BROWN, III, JUDGE

Copies: Timothy Woolford, Esq. ESERVED
C. Edward Browne, Esq. MAIL —

ATTEST:

NOTICE OF ENTRY OF ORDER OR DECREE
PURSUANT TO PA. R.C.P. NO. 236
NOTIFICATION - THE ATTACHED DOCUMENT
HAS BEEN FILED IN THE CASE
PROTHONOTARY OF LANCASTER CC., PA
DATE: 5-7-18

26